BERG & ANDROPHY
DAVID BERG
3704 Travis St.
Houston, TX 77002
Telephone: (713) 529-5622
dberg@bafirm.com

THE GOLAN LAW FIRM
YVETTE GOLAN
1919 Decatur St.
Houston, TX 77007
Telephone: (866) 298-4150 ext. 101
ygolan@tgfirm.com

FLASHPOINT LAW, INC.
SHIRISH GUPTA (SBN 205584)
1900 S. Norfolk Street, Suite 350
San Mateo, CA 94403
Telephone: (650) 539-4019
sgupta@flashpointlaw.com

Attorneys for Plaintiffs Michael Bates and Vanessa Gibson

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MICHAEL BATES and VANESSA GIBSON, <br><br> Plaintiffs, <br><br> v. <br><br> KASHI COMPANY, a California corporation; KELLOGG COMPANY, a Delaware corporation; DAVID DENHOLM, DAVID DESOUZA; and DOES 1-100, <br><br> Defendants. | Case No.  3:11-cv01967-H-BGS <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

Plaintiffs Michael Bates and Vanessa Gibson ("Plaintiffs"), by their attorneys, bring this class action against Kashi Co., Kellogg Co., David Denholm, David DeSouza, and Does 1 through 100 ("Defendants"), on their own behalf and on behalf of all others similarly situated, and allege as follows based upon the investigation of their counsel:

**INTRODUCTION**

1.      This is a class action on behalf of a national class of consumers who purchased Kashi products that were falsely and misleadingly labeled as "all natural" and/or contained "nothing artificial," which in fact contained unnaturally processed ingredients and synthetic ingredients.

2.      Since at least 1999, Defendants prominently displayed the promises "all natural" and/or "nothing artificial" on the front labels of almost all of its products, cultivating a healthy and socially conscious image in an effort to promote the sale of these products. Defendants knew these claims to be false.

3.      Defendants inserted a spectacular array of unnaturally processed and synthetic ingredients to its so-called "all natural" products.  For example, Kashi's so-called "All Natural" GoLean Shakes are *composed almost entirely* of synthetic and unnaturally processed ingredients, including sodium molybdate, phytonadione, sodium selenite, magnesium phosphate, niacinamide, calcium carbonate, calcium phosphate, calcium pantothenate, pyridoxine hydrochloride, thiamin hydrochloride, potassium iodide, and other substances that have been declared to be synthetic substances by federal regulations.

4.      In many of Defendants' products, unnaturally processed and synthetic ingredients constitute the *primary* ingredients in these fraudulently-labeled "all natural" foods.  For example, there is more leavening (a combination of sodium bicarbonate, sodium acid pyrophosphate, and monocalcium phosphates) than all the Seven Whole Grains & Sesame Flour *combined* in Kashi's Heart to Heart® Waffles – Honey Oat.

5.      Many of these ingredients are shocking, especially given Defendants' heavily-marketed "Real Food Values."  For example, Defendants added several ingredients that the FDA has not made its own determination as being GRAS, or "generally recognized as safe" as a food additive. Defendants added synthetic substances listed as prescription drugs to its foods, irradiated substances, pesticides that are a by-product of uranium mining, and federally declared hazardous substances.  Defendants also added several highly processed excitotoxins to its products that are hidden sources of monosodium glutamate, a.k.a. "MSG."

6.      Many of the ingredients require production methods that greatly damage the

1

environment. For example, Defendants add **sodium acid pyrophosphate** to many of its foods. Producing this federally-listed synthetic substance requires thermally-produced phosphoric acid, an air pollutant, water pollutant, and ecological pollutant. Phosphoric acid can lower the pH of aquatic ecosystems for an extended period of time, posing risk to aquatic life. Mining operations of phosphate rock can leave tailings piles containing elevated levels of cadmium, lead, nickel, copper, chromium, and uranium – waste products that can leach toxic heavy metals in plant and marine life.

7.      Many of the ingredients added to Defendants' foods are "safe" as food additives. Yet Defendants did not simply claim that its food products are "all safe." Defendants fraudulently claimed that its food products are "all natural" and/or contained "nothing artificial." Defendants' misrepresentations are demonstrably false; Defendants injected ingredients into its foods that have been federally declared as synthetic compounds or require synthetic compounds or extensive processing techniques to produce to be safely used as a food additive.

8.      Consumers lack the ability to test or independently ascertain the accuracy of a food label, especially at the point of sale. Reasonable consumers must and do rely on the food company to honestly report the nature of a food's ingredients.

9.      Food companies intend consumers rely upon the food label, and reasonable consumers do in fact so rely. The food label is the only available source of information consumers can use to make decisions on whether to buy and ingest packaged foods.

10.     As a result of their false and misleading labeling, Defendants were able to sell these products to hundreds of thousands of consumers throughout the United States and to profit handsomely from these transactions.

11.     Defendants' false and misleading representations and omissions violate state and federal law, both civil and criminal, detailed more fully below, including California's Unfair Competition Law, California's Consumer Legal Remedies Act, Michigan's Consumer Protection Act, common law, and federal statutes.

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act

2

("CAFA").  28 U.S.C. § 1332(d).  Jurisdiction under CAFA is met because: (1) the proposed number of putative class members exceeds 100; (2) at least one plaintiff and one defendant are citizens of different states; and (3) the amount in controversy, including, but not limited to the aggregate amount of relief sought by absent class members, exclusive of interest and costs, exceeds $5 million.

13.     This Court has personal jurisdiction over Defendants because each is a corporation or individual with sufficient minimum contacts in California or otherwise intentionally avails itself of the laws of this State through its marketing and sales of the products at issue in California so as to render the exercise of jurisdiction by this Court consistent with traditional notions of fair play and substantial justice.

14.     Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this district, because Kashi's principal place of business is within this district, and because this Court has personal jurisdiction over all Defendants.

15.     No other forum would be more convenient for the parties and witnesses to litigate this action.

**PARTIES**

16.     Plaintiff Vanessa Gibson is currently a resident of Novato, California.  Beginning at least seven years ago, Plaintiff Gibson purchased Defendants' Falsely Labeled products for herself, her husband, and her three children (who were then infants, and now range from eight to eleven years of age).  Until the past six months, Plaintiff Gibson continued to purchase Defendants' Falsely Labeled Products for herself, her husband, and her three children on multiple occasions from grocery stores in Novato, California, including Safeway, Trader Joe's and Whole Foods.   Plaintiff Gibson purchased, and she and her three children ingested Defendants' Falsely Labeled products on a regular basis, usually four to six servings a month each, and usually the products Kashi TLC™ All Natural Crunchy Granola Bars: Honey Toasted, Pumpkinspice Flax and Roasted Almond, and Kashi Heart to Heart® Cereal – Honey Toasted.  Plaintiff Gibson also purchased and she and her family ingested other of Defendants' Falsely Labeled Products from

time to time throughout the years.  Plaintiff Gibson saw Defendants' representations that these products were "all natural" on the front of every package she purchased and/or ingested, and saw these misrepresentations each time she purchased and/or ingested the product.  Relying on Defendants' misrepresentations and omissions of material facts, Plaintiff Gibson reasonably believed the products she purchased and ingested were all natural, and these representations were one of the reasons for her purchase.  Plaintiff Gibson was deceived because not all ingredients in these products were "all natural," including the unnaturally processed ingredients and synthetic ingredients listed as Unnatural Substances below.  Plaintiff Gibson would not have purchased Defendants' Falsely Labeled Products had she known the truth of the misrepresentations and omissions of material facts detailed below.  Plaintiff Gibson no longer purchases Defendants' Falsely Labeled Products.

17.     Plaintiff Michael Bates is currently a resident of Houston, TX.  Plaintiff Bates purchased and/or ingested Kashi products on multiple occasions.  Most recently, on August 16, 2011, Plaintiff Bates went to a Whole Foods grocery store on 2955 Kirby Dr. in Houston, Texas, and purchased Kashi TLC™ All Natural Chewy Cookies - Happy Trail Mix and Kashi TLC™ All Natural Crackers - Honey Sesame.  *See* Receipt of Purchase by Michael Bates, attached as Exhibit 1.  Defendants labeled both of these products as "all natural."  Plaintiff Bates ingested these products.  Plaintiff Bates saw Defendants' representations that these products were "all natural" on the front of every package he purchased and/or ingested, and saw these misrepresentations each time he purchased and/or ingested the product.  Relying on Defendants' misrepresentations and omissions of material facts, Plaintiff Bates reasonably believed the products he purchased and ingested were all natural, and these representations were one of the reasons for his purchase.  Plaintiff Bates was deceived because not all ingredients in these products were "all natural," including the unnaturally processed ingredients and synthetic ingredients listed as Unnatural Substances below.

18.     Defendant Kashi Co. is a corporation with its principal place of business located at 4275 Executive Sq. Suite 500, La Jolla, California 92037-1477.  Kashi Co.'s products are distributed nationwide in supermarkets, grocery stores, convenience stores, online retailers, and other

4

venues.  Kashi Co. also sells its products online at www.kashistore.com. ("Kashi Store").  Kashi Co. owns Kashi Store, and Kashi Co. and Kashi Store are collectively referred to as "Kashi."  In 2000, Kashi was acquired by Kellogg Co., one of the world's largest food companies.

19.     Defendant Kellogg Co. is a corporation organized under the laws of the State of Delaware. Kellogg is the world's leading producer of cereal and a leading producer of convenience foods. Kellogg maintains its principal business office at One Kellogg Square, P.O. Box 3599, Battle Creek, Michigan 49016-3599.  Kellogg, directly and through its agents, has substantial contacts with and receives benefits and income from and through the State of California.  In 2000, Kellogg purchased Kashi, and Kellogg controls Kashi as a wholly-owned subsidiary.

20.     Defendant David Denholm is an individual and a resident of the State of Michigan.  He is the President of Kellogg Co.  He joined Kellogg Co. in 2003 as Director of Business Development.  In 2004, he served as the General Manager of Kashi, and substantially grew Kashi in size, revenue, and product lines.  Defendant Denholm controlled and directed Defendants Kellogg and Kashi to commit the alleged fraudulent representations and omissions, and he is personally liable for the acts herein alleged.

21.     Defendant David DeSouza is an individual and a citizen residing in the state of California.  He is the General Manager of Kashi.  In the past, he served as Kashi's Vice President of Marketing and Innovation, and as Kashi's Commercial Director.  He also served in various director and manager posts at Kellogg's branding department, including as a Senior Brand Manager.  Defendant DeSouza controlled and directed Defendants Kellogg and Kashi to commit the alleged fraudulent representations and omissions, and he is personally liable for the acts herein alleged.

22.     Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein as DOES 1 through 100, and therefore sue these Defendants by fictitious names.  Plaintiffs will amend this Complaint to allege the true names and capacities of these fictitiously-named Defendants when they are ascertained. Plaintiffs are informed and believe and based thereon allege that DOES 1 through 100 do business in San Diego County.  Plaintiffs are informed and

believe and based thereon allege that at all relevant times each of DOES 1 through 100 is the supplier, manufacturer, examiner, certifier, formulator, engineer, or reseller of the Unnatural Substances, or the agent, servant, partner, joint-venturer, co-venturer, principal, director, officer, manager, employee, affiliate, assignee, successor-in-interest, alter-ego, shareholder, or representative of Kellogg and/or Kashi, and was acting in such capacity in doing the things herein complained of and alleged.

## DEFENDANTS HOLD KASHI TO BE AN ALL-NATURAL FOODS BRAND

23.     American consumers increasingly and consciously seek out "all natural" ingredients in their packaged foods.  Once a small niche market, the natural foods market was a $22.8 billion industry in 2009, and continues to grow today.

24.     Consumers value "all natural" ingredients for a myriad of reasons, including perceived benefits of avoiding disease, attaining health and wellness, helping the environment, assisting local farmers, assisting factory workers who would otherwise be exposed to synthetic and hazardous substances, and financially supporting the companies that share these values.

25.     Hoping to capture this growing market, Defendants label and advertise their products as "all natural."

26.     Defendants also carefully cultivated Kashi's public image as a healthy, eco-friendly, worker-friendly brand – the kind of company whose label claims should be truthful.  Defendants further market Kashi as an expert source of all things natural.  For example, Defendants market Kashi as providing "Real Food Values " and being "7 Whole Grains on a Mission.$^{TM}$"  Defendants showcase Kashi's "all natural" persona in its "2011 REAL Tour."  Defendants market Kashi as an expert in environmental programming and information, capitalizing on Kashi's political image, offering advice on sustainability, organic farming, and broadcasting environmental videos.

27.     In its website, magazine ads, and in other marketing materials, Kashi showcases its all-natural real-food image, offering consumers the "Kashi Ingredient Decoder,$^{TM}$" which Defendants describe as a "handy tool [that] will help you figure out what's real on ingredient

FIRST AMENDED CLASS ACTION COMPLAINT

labels."  Kashi Online Ingredient Decoder, available at www.kashi.com/real_food/ingredients;

Kashi Pdf Ingredient Decoder, available at www.kashi.com/pdf/Kashi_Ingredient_Decoder.pdf

and attached as Exhibit 2; Kashi Ingredient Decoder, as appearing in the May 2011 issue of Real

Simple, pp. 264-265, and attached as Exhibit 3.

## DEFINITION OF "ALL-NATURAL"

28.     Representing that a food product or ingredient is "all natural" or contains "nothing

artificial" is a statement of fact, and these terms have been defined by the federal governmental

agencies that regulate food companies such as Defendants.

29.     The FDA has defined the outer boundaries of the use of the term "natural" by stating that

a product is not natural if it contains synthetic or artificial ingredients.  FDA Consumer Health

Information, Food Label Helps Consumers Make Healthier Choices, available at

www.fda.gov/downloads/ForConsumers/ConsumerUpdates/UCM199361.pdf.

30.     According to federal regulations, an ingredient is synthetic if it is:

> [a] substance that is formulated or manufactured by a chemical process or by a
> process that chemically changes a substance extracted from naturally occurring
> plant, animal, or mineral sources, except that such term shall not apply to
> substances created by naturally occurring biological processes."

7 C.F.R. § 205.2.

31.      According to federal regulations, an ingredient is artificial if it "is not derived from a

spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or

similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products

thereof."  21 C.F.R. § 101.22(a).

32.     Similarly, the USDA's Food Safety and Inspection Service ("FSIS") defines a "natural"

product as a product that does not contain any artificial or synthetic ingredient and does not

contain any ingredient that is more than "minimally processed:"

> Minimal processing may include: (a) those traditional processes used to make
> food edible or to preserve it or to make it safe for human consumption, e.g.,
> smoking, roasting, freezing, drying, and fermenting, or (b) those physical
> processes which do not fundamentally alter the raw product and/or which only
> separate a whole, intact food into component parts, e.g., grinding meat, separating

7

eggs into albumen and yolk, and pressing fruits to produce juices.

Relatively severe processes, e.g., solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing. . . .

USDA FSIS, Food Standards and Labeling Policy Book, available at

www.fsis.usda.gov/OPPDE/larc/Policies/Labeling_Policy_Book_082005.pdf

33.     Defendants have not disclaimed the federal agencies' definitions of "natural."  In fact,

Defendants have explicitly embraced the federal definitions of "natural."

34.     Kellogg endorses the FDA informal definition, repeating the definition on its website:

**What are "natural" foods?**
The U.S. Food and Drug Administration informally defines "**natural**" foods as foods without anything artificial or synthetic included or added, including color additives. The U.S. Department of Agriculture (USDA) policy is that a natural product does not contain any artificial flavor or color, chemical preservatives, or any other artificial or synthetic ingredient, and the product and its ingredients are not more than minimally processed.

Kellogg Website (emphasis original), available at www.kelloggsnutrition.com/eat-well/natural-

organic-foods.aspx.





35.     For the Kashi products, Defendants have publicly represented that they apply a more rigorous definition and posted this definition online:



**At Kashi, we define natural as:**

Natural food is made without artificial ingredients like colors, flavors or preservatives and is minimally processed.

A natural ingredient is one that comes from or is made from a renewable resource found in nature.

Minimal processing involves only kitchen chemistry, processes that can be done in a family kitchen and does not negatively impact the purity of the natural ingredients.

Kashi Yearbook, www.kashi.com/meet_us/yearbook, attached as Exhibit 4, page 5 (document page 10).

36.     A reasonable consumer would expect that when Defendants label their product as "all natural," the product's ingredients are "natural" as defined by federal agencies, which govern Defendants.  A reasonable consumer would also expect that when Defendants label their product as "all natural," the product's ingredients are "natural" under the Defendants' own published definition of "natural."

37.     A reasonable consumer's understanding of the term "natural" and "nothing artificial" comports with federal law and the Defendants' proffered definition.  That is, a reasonable consumer understands the term "natural" to mean that none of the ingredients are synthetic, none of the ingredients are artificial, and none of the ingredients have undergone more than minimal processing.

**FALSE REPRESENTATIONS THAT CERTAIN PRODUCTS ARE "ALL NATURAL" AND/OR CONTAIN "NOTHING ARTIFICIAL"**

38.     Defendants made false, misleading, and deceptive representations that the below "Falsely

9

Labeled Unnatural Products" are "all natural" by prominently labeling the product packages as

"ALL NATURAL," including by way of example and without limitation:

a) Bars:
   i. Kashi GoLean® Crunchy! All Natural Protein & Fiber Bars: Chocolate Pretzel, Cinnamon Coffee Cake, Chocolate Almond, Chocolate Caramel, Chocolate Peanut
   ii. Kashi GoLean® All Natural Protein & Fiber Bars: Chocolate Malted Crisp, Oatmeal Raisin Peanut Butter & Chocolate
   iii. Kashi GoLean® Roll! All Natural Protein & Fiber Bars: Caramel Peanut, Chocolate Peanut, Chocolate Turtle, Fudge Sundae, Oatmeal Walnut
   iv. Kashi GoLean® All Natural Chewy Protein & Fiber Bars: Chocolate Almond Toffee, Cookies 'N Cream, Malted Chocolate Crisp, Oatmeal Raisin, Peanut Butter Chocolate
   v. Kashi TLC™ All Natural Soft-Baked Snack Bars:  Baked Apple Spice, Blackberry Graham, Ripe Strawberry, Baked Cherry Vanilla
   vi. Kashi TLC™ All Natural Chewy Granola Bars: Cherry Dark Chocolate, Honey Almond Flax, Peanut Peanut Butter, Trail Mix, Dark Mocha Almond
   vii. Kashi TLC™ All Natural Crunchy Granola Bars: Honey Toasted, Pumpkinspice Flax, Roasted Almond
   viii. Kashi TLC™ All Natural Fruit & Grain Bars: Dark Chocolate Coconut, Cranberry Walnut, Pumpkin Pecan
b) Kashi GoLean® All Natural Creamy Instant Hot Cereal: Truly Vanilla
c) Kashi GoLean® All Natural Hearty Instant Hot Cereal: Honey & Cinnamon
d) Kashi GoLean ® All Natural Shakes: Chocolate, Vanilla
e) Kashi TLC™ All Natural Chewy Cookies: Happy Trail Mix, Oatmeal Dark Chocolate, Oatmeal Raisin Flax
f) Kashi TLC™ All Natural Crackers: Mediterranean Bruschetta, Stoneground 7 Grain, Roasted Garlic & Thyme, Country Cheddar, Honey Sesame, Fire Roasted Vegetable, Asiago Cheese, Original 7 Grain, Natural Ranch
g) Kashi TLC™ All Natural Pita Crisps:  Original 7 Grain with Sea Salt, Zesty Salsa
h) Kashi GoLean® All Natural Waffles: Original, Strawberry, Blueberry
i) Kashi All Natural Waffles: 7 Grain, Blueberry
j) Kashi All Natural Stone-Fired Thin Crust Pizza: Mushroom Trio & Spinach, Pesto, Margherita, Mediterranean, Roasted Vegetable, Mexicali Black Bean, Caribbean Carnival, Five Cheese & Tomato, Roasted Garlic Chicken, Tomato Garlic Cheese

Falsely Labeled Unnatural Product packages are attached as Exhibit 5.

39.    Defendants additionally falsely represented on the packages of several of the Falsely

Labeled Unnatural Products that, in addition to being "All Natural," the product also contained

"Nothing Artificial."  *See* Ex. 5.

40.    Further inducing consumers to rely on the deceptive representations that these products

are "all-natural," Defendants did not label other Kashi products as "all natural," leading consumers to believe that Defendants carefully studied each of the products' ingredients to ensure that the "all-natural" claim is made only on those products that are truly all natural.

41.     Defendants have discontinued offering some of the Falsely Labeled Unnatural Products, have altered the packaging, altered the ingredients, or have selectively marketed the products. Defendants also regularly introduce new products that are also falsely labeled as "all natural" or as containing "nothing artificial."  The identity of these additional products will be ascertained through discovery and are included in the list of Falsely Labeled Unnatural Products.

**THE FALSELY LABELED PRODUCTS CONTAIN UNNATURAL SUBSTANCES**

42.     Contrary to Defendants' false representations that its Falsely Labeled Unnatural Products were "all natural," each Falsely Labeled Unnatural Product contained one or more of the below unnaturally processed ingredients, synthetic ingredients, and artificial substances (herein collectively, "Unnatural Substances").  The ingredient labels of Falsely Labeled Products are attached as Exhibit 6.

*Bromelain* is an enzyme derived from pineapple.  21 C.F.R. § 184.1024.  According to the National Library of Medicine's Hazardous Substances Data Bank ("HSDB"), its production requires acetone, which is a hazardous synthetic substance.  U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995); 40 C.F.R. § 302.4 (hazardous).  Though it is a naturally occurring substance, bromelain added as a food ingredient is thus made with a hazardous synthetic ingredient that negatively impacts the purity of the natural ingredient, rendering it no longer "natural" under Kashi's own published definition.

*Calcium carbonate* requires production processes that render it no longer "natural."  It is produced from calcium hydroxide, calcium chloride, or as a byproduct in the lime soda process.  21 C.F.R. § 184.1191.  Federal regulations recognize calcium hydroxide as a synthetic compound, 7 C.F.R. § 205.605(b), and the FDA has declared that calcium chloride renders a food no longer "natural."  FDA Warning letter to Karl A. Hirzel, Hirzel Canning Co., (Aug. 29,

11

2001).  The lime soda process employs hazardous and synthetic substances and requires processing techniques so excessive so as to render the finished product unnatural.  *See* calcium chloride, below.  In fact, the EPA has promulgated regulations specifically addressing the environmental impact of calcium carbonate produced through the lime process and by recovery from Solvay waste products.  40 C.F.R. § 415.300 *et seq*.  When used in drugs, it is recognized as a synthetic compound.  21 C.F.R. § 73.1070(a)(1).

**Calcium caseinate** is produced using calcium hydroxide, a synthetic substance, 7 C.F.R. § 205.605(b), and through severe processing methods that form lysinoalanine, a toxin.  Database of Select Committee on GRAS Substances (SCOGS) Reviews Report 96, ID Code 9005-43-0, Calcium Caseinate.

**Calcium chloride** is listed as a synthetic substance.  U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  It renders a food product no longer "natural," and the FDA has issued warning letters to food companies that falsely label products as "natural" when they contain calcium chloride.  *See, e.g.,* FDA Warning letter to Karl A. Hirzel, Hirzel Canning Co., (Aug. 29, 2001).

Food-grade calcium chloride can be produced by one of three methods.  21 C.F.R. § 184.1193.  It can be produced synthetically by the Solvay process, which reacts ammonia and ammonium chloride, both hazardous substances, 40 C.F.R. § 116.4, and calcium hydroxide, a synthetic substance. 7 C.F.R. § 205.605(b); National Organic Standards Board ("NOSB") Technical Advisory Panel Review, Calcium Chloride, September 28, 2001 at 2-3.   It can be produced synthetically by reacting hydrochloric acid (a hazardous substance, 40 C.F.R. § 116.4) and calcium carbonate (a synthetic substance, 21 C.F.R. § 184.1191).  NOSB Technical Advisory Panel Review, Calcium Chloride, September 28, 2001 at 2.  Calcium chloride can also be produced by refining brine, employing synthetic chemicals in the purification process.  The EPA has promulgated regulations specifically addressing the environmental impact of calcium chloride produced through brine extraction.  40 C.F.R. § 415.40 *et seq*.  In this process, brine is pumped from underground salt beds and is treated with chlorine gas, a synthetic material.  NOSB Technical Advisory Panel Review, Calcium Chloride, September 28, 2001 at 3.  The chlorine gas

12

oxidizes bromide to bromine, both toxic chemicals.  *Id.* at 3, 6.  Limestone is then heated to produce calcium oxide, changing the molecular structure of the limestone, rendering it synthetic.  *Id.*  The lime is added to the brine solution, creating synthetic magnesium hydroxide.  *Id.*  Some of the synthetic lime remains in the final calcium chloride product.  *Id.*

By FDA regulation, ***calcium pantothenate*** is synthetically prepared from isobutyraldehyde, a synthetic flavoring substance and toxic chemical, 21 C.F.R. § 184.1212; 40 C.F.R. § 372.65, and formaldehyde, a hazardous substance, 40 C.F.R. § 116.4, via 1,1-dimethyl-2-hydroxy-propionaldehyde and pantolactone." 21 C.F.R. § 184.1212.

***Calcium phosphate*** is recognized by federal regulations to be a synthetic substance.  7 C.F.R. § 205.605(b).  Its production creates waste-water pollutants that require specialized federal environmental control technology.  40 C.F.R. § 422.30.  Calcium phosphate is produced using synthetic hazardous compounds such as phosphoric acid or sodium triphosphate, and/or hazardous compounds such as hydrochloric acid or sulfuric acid.

***Calcium stearate*** is a synthetic substance.  National Organic Standards Board Meeting Minutes September 17-19, 2002, at 22; U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  It is produced by mixing calcium chloride and sodium stearate in aqueous solution.  21 C.F.R. § 173.340.  Both calcium chloride and sodium stearate are federally recognized synthetic compounds.  U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).

***Disodium phosphate*** is a synthetic substance, 7 C.F.R. § 205.605(b), produced by the neutralization of phosphoric acid, a synthetic pollutant.  7 C.F.R. § 205.605(b), 40 C.F.R. § 116.4.

***Ferrous fumarate*** is produced by admixing hot solutions of ferrous sulfate, a synthetic hazardous substance, 7 C.F.R. § 205.605; 40 C.F.R. § 116.4, and sodium fumarate. 21  C.F.R. § 184.1307d(a).

***Glycerin*** is a synthetic substance.  7 C.F.R. § 205.605; 7 C.F.R. § 205.603.  According to HSDB, glycerin is produced through various extensive means using synthetic and/or hazardous substances, including epichlorohydrin (hazardous), sodium hydroxide (synthetic and hazardous),

13

allyl alcohol (synthetic and hazardous), hydrogen peroxide (synthetic), and peracetic acid (synthetic).  7 C.F.R. § 205.601; 7 C.F.R. § 205.605; 40 C.F.R. § 116.4.

*Lactic acid* occurs naturally in the human body and it exists naturally in some foods. However, to be legally included as a food ingredient, it must be produced by fermentation of carbohydrates such as glucose or by forming lactonitrile from acetaldehyde and hydrogen cyanide and subsequent hydrolysis.  21 C.F.R. § 184.1061(a).  It is thus a federally-listed synthetic substance.  U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  The federal government does not consider lactic acid to be safe in infant foods.  21 C.F.R. § 184.1061(c)(2).  Lacitc acid is a preservative. E270.

*Magnesium phosphate*.  Under federal regulation, 21 C.F.R. § 184.1434(a), magnesium phosphate can be prepared in one of two ways:  by treating magnesium sulfate with disodium phosphate, both synthetic substances, 7 C.F.R. 205.601(j)(5); 7 C.F.R. § 205.605(b); or by treating magnesite with phosphoric acid, a synthetic and hazardous substance.  7 C.F.R. § 205.605; 40 C.F.R. § 116.4.

*Malic acid* is a synthetic compound. U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  Malic acid is also a preservative. E296.  Racemic DL-malic acid does not occur naturally.  It is synthetically produced by the hydration of fumaric acid or maleic acid. 21 C.F.R. § 184.1069. Both fumaric acid and maleic acid are hazardous substances. 40 C.F.R. § 116.4. Malic acid is not permitted in baby foods. 21 C.F.R. § 184.1069(d).

Under federal regulation, *magnesium oxide,* is produced by heating magnesium hydroxide or magnesium carbonate.  21 C.F.R. § 184.1431.  Both magnesium hydroxide and magnesium carbonate are synthetic substances.  7 C.F.R. § 205.603 (a)(11); 7 C.F.R. § 205.605.

*Maltodextrin* is saccharide polymer that is produced through the non-kitchen-chemistry process of partial acid and enzymatic hydrolysis of starch. 21 C.F.R. § 184.1444(a).

*Niacinamide* "is the chemical 3-pyridinecarboxylic acid amide (nicotinamide)."  21 C.F.R. § 184.1535.  It is federally recognized as a synthetic substance.  U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  It is usually

14

prepared by esterifying nicotinic acid with methanol, followed by ammonolysis.  It is alternately prepared by passing ammonia gas (a hazardous substance) into molten nicotinic acid or from partial hydrolysis of 3-cyanopyridine.

**Pectin** is a plant polysaccharide often found in home-made products such as jam.  However, to be added as a food ingredient to a processed food, federal regulations require it to be precipitated with ethanol or isoproponol (synthetic substances, 7 C.F.R. § 205.601), or as the copper or aluminum salt.  21 C.F.R. § 184.1588.   Accordingly, pectin is federally declared to be a synthetic substance.  7 C.F.R. § 205.605(b).

**Plant sterols**, also known as phytosterols, are produced by chemical extraction, through highly refined solvent-extracted vegetable oils, or by further refining the sterol ester by-products of methyl ester production.

**Potassium bicarbonate** is a synthetic substance.  7 C.F.R. § 205.601(i)(9).  It is made by treating a solution of potassium hydroxide or potassium carbonate (both synthetic substances, 7 C.F.R. § 205.605(b)) with carbon dioxide.  21 C.F.R. § 184.1613.

**Potassium carbonate** is a synthetic substance.  7 C.F.R. § 205.605(b).  It is produced by electrolysis (a more-than-minimal process) of potassium chloride or by potassium hydroxide (a synthetic substance). 21 C.F.R. § 184.1619(a); 7 C.F.R. § 205.605(b).

**Potassium chloride** is produced through fractional crystallization or flotation (dissolved air flotation, induced gas flotation, or froth flotation), more-than-minimal processing methods that are beyond family kitchen chemistry.  21 C.F.R. §  184.1622.  The EPA has promulgated regulations specifically addressing the environmental impact of potassium chloride production.  40 C.F.R. § 415.500 *et seq*.  Food-grade potassium chloride often contains additional synthetic substances as anti-caking agents, such as tricalcium phosphate, silicon dioxide, or magnesium hydroxide carbonates. 7 C.F.R. § 205.605(b).

**Potassium iodide** is "prepared by reacting hydriodic acid (HI) with potassium bicarbonate."  21 C.F.R. § 184.1634(a).  Potassium bicarbonate is a synthetic substance.  7 C.F.R. § 205.601(i)(9).

1    *Sodium acid pyrophosphate* is a synthetic substance. 7 C.F.R. § 205.605.  Its production

2    requires thermally-produced phosphoric acid, an environmental pollutant that increases toxic

3    heavy metals in plants and marine life.  Sodium acid pyrophosphate is produced by the

4    incomplete decomposition of monobasic sodium phosphate (a synthetic compound) or by partial

5    neutralization of phosphoric acid (a synthetic pollutant) with sodium hydroxide (a synthetic and

6    hazardous substance) or sodium carbonate to form monosodium phosphate (a synthetic

7    compound), and then dehydrated at high temperatures. 7 C.F.R. § 205.605; 40 C.F.R. § 116.4.

8    *Sodium citrate* is a synthetic substance.  7 C.F.R. § 205.605.  It is prepared by

9    neutralizing citric acid (a synthetic substance) with sodium hydroxide (a synthetic and hazardous

10   substance) or sodium carbonate (a more-than-minimally-processed substance).

11   *Sodium molybdate* has not been declared to be generally recognized as safe by the FDA.

12   According to HSDB, molybdenum salts are by-products of uranium mining and can be found in

13   fertilizers for leguminous crops, citing American Conference of Governmental Industrial

14   Hygienists. Documentation of the TLV's and BEI's with Other World Wide Occupational

15   Exposure Values. CD-ROM Cincinnati, OH 45240-1634 2007.

16   *Sodium Selenite* is a hazardous substance.  40 C.F.R. § 302.4, 40 C.F.R. § 116.4.  The

17   FDA has not declared it generally recognized as safe as a food additive, but it is approved for use

18   as an animal feed additive.  21 C.F. R. § 573.920.

19   *Xanthan Gum* is a synthetic substance. 7 C.F.R. § 205.605.  Defendants knew that

20   Xanthan Gum is not a "Real Food," giving it a thumbs-down rating in its Ingredient Decoder:

21
22   👎 XANTHAN GUM: Processed using petrochemicals, this is used to create sticky dough.

23   *See* Ex. 3.

24   43.    Defendants add *ActiVin® grape seed extract* to some of the Falsely Labeled Products.

25   The producers of ActiVin® grape seed extract, San Joaquin Valley Concentrates, presented the

26   substance to the FDA.  The FDA declared the substance to be a chemical preservative.   Agency

27   Response Letter GRAS Notice No. GRN 000124, August 1, 2003.

28

44.     ActiVin® is produced through a patented process called ActiPure,™ requiring a number of more than minimal processes and synthetic chemicals that render ActiVin® no longer "natural."  *See* U.S. Patent #5,912,363.  For example, synthetic resins are used to produce ActiVin®, including XUS-43520 00, a hydrophobic microporous divinylbenzene copolymer that is manufactured by a proprietary process and which must be regenerated periodically by caustic agents, such as sodium hydroxide, a synthetic hazardous substance under federal regulations. 7 C.F.R. § 205.605(b); 40 C.F.R. § 116.4.  The resins are then washed with citric acid, lactic acid, sulfuric acid, hydrochloric acid, and/or phosphoric acids, which are all synthetic and hazardous compounds.

45.     ***Glutamic Acid***, a.k.a. glutamate, is a highly processed flavor enhancer and excitotoxin that is not "natural" when used as a food additive.  When added to a food product, glutamic acid includes D-glutamates, a type of glutamate that does not exist naturally in foods.  There is no way to extract the naturally-occurring L-glutamates from food in an amount needed commercially.

46.     In their discussions of glutamic acid found on their Ingredient Decoder or online, Defendants do not disclose how they produce glutamic acid for their products.  However, according to HSDB, all methods of glutamate production require more than minimal production techniques such as acid hydrolysis, chemical synthesis with hydrochloric acid, using ammonium salts for microbial growth and gaseous ammonia to maintain a neutral pH, and other non-kitchen methods using synthetic compounds.

47.     L-glutamates and D-glutamates have important functional differences.  Enzymes that work on the naturally occurring L-glutamic acid do not recognize, and therefore ignore, D-glutamic acid.  Thus, D-glutamic acid is more likely to remain in its free form than L-glutamic acid.  When in their free form, glutamic acid is an excitotoxin suspected to cause neural damage and a variety of chronic diseases.  In fact, monosodium glutamate ("MSG") is a popularly avoided substance due to the effects of free glutamic acid.  The excited neurotransmitters perceive flavor more (thus glutamic acid is a flavor enhancer), but these excited neurotransmitters also induce other activity, such as decreasing dopamine and seratonin (which

17

can lead to depression and Parkinson's Disease), killing oligodendrocytes and decreasing myelin (which can lead to multiple sclerosis), increasing prolactin (which, along with the decreased dopamine, can result in infertility), and increasing the risk of a nut allergy.

48.     Defendants also list **yeast extract**, **autolyzed yeast,** and **autolyzed yeast extracts** as added ingredients in its foods.  These substances contain free glutamates and other substances and are so highly processed they cannot be considered to be "all natural."

49.     Defendants add "**chicory root fiber**" to some products.  According to Kashi's "Ingredient Decoder," Defendants extract **inulin**, an increasingly popular food additive, from chicory root. *See* Exs. 2, 3.  Known as "invisible fiber," it is added to foods and beverages to artificially increase fiber content without the typical fiber mouth-feel.  According to the USDA, inulin is extracted from the root of the chicory plant (Cichorium intybus) by a hot water diffusion process. Subsequently, the extracted inulin is partially enzymatically hydrolyzed to yield oligofructose enriched inulin. The hydrolyzate is dried to a powder for application in foods. Enzyme hydrolyzation reduces the chemical chain length of the oligosaccharide polymer resulting in varying functional properties between inulin and the oligofructose enriched form. The shorter polymer chain length increases polymer solubility and facilitates product texture and consistency.  *See* 72 Fed. Reg. 27259-62, available at http://tinyurl.com/3cj9tqp

50.     Defendants further process inulin through purification, modification, and enzymatic treatment to produce oligosaccharide and oligofructose, alternative sweeteners.  *See* Exs. 2-3. These substances do not exist naturally as separated compounds.  They are "new foods;" manufactured creations that do not exist in nature.

51.     Defendants add "**enzymes**" to some of the Falsely Labeled Products.  In some cases, Defendants have concealed what type of enzyme is used, violating federal regulation.

52.     Defendants have admitted to using **microbial rennet**, a coagulating enzyme, to some of its foods.  Defendants have further admitted that their microbial rennet comes from microorganisms that have been altered by some unspecified "modern advances."  Defendants explain:

Traditionally, rennet was derived from the stomachs of cows or goats. However,

18

> modern advances have enabled microorganisms to produce enzymes that mimic animal rennet. The cheese we use in Kashi products is vegetarian and derived from microbial sources.

From http://www.kelloggs.com/cgi-bin/brandpages/faq/faq.pl?skin=kashi;id=3694, also available at http://tinyurl.com/3e94m9w and attached as Exhibit 7.

53.     More than minimal non-kitchen processes are necessary to isolate the enzyme as a food additive, synthetic chemicals are often used to extract and purify the enzyme, and sometimes, as is the case in Defendants' microbial rennet, unnatural steps are adopted to alter the natural enzyme or source, inhibiting or enhancing their functioning abilities.  Genetic modification or protein engineering are examples of such methods.

54.     Defendants have included several Unnatural Substances that act as nutrient supplements, misleading consumers to believe that the nutrient is from a natural source, rather than a synthetic supplement.  Federal regulations recognize that nutrient vitamins and minerals are synthetic when added to processed foods.  7 C.F.R. § 205.605(b); U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).

55.     Moreover, Defendants falsely describe many of the synthetic substances as being the same as a certain vitamin, when in fact the two are altogether different chemical compounds.

56.     Defendants add **Phytonadione** to some of its products.  Phytonadione is 2-methyl-3-phytyl-1, 4-naphthoquinone.  According to HSDB, it is synthetically produced from 2-methyl-1,4-naphthoquinone and phytol, or from the partial syntheses from menadione and phytol, using a pi-allylic nickel(I) complex.  Its injectable form is a prescription drug, listed in the Approved Drug Products with Therapeutic Equivalence Evaluations List.  DHHS/FDA; Electronic Orange Book-Approved Drug Products with Therapeutic Equivalence Evaluations, App. A-41 available at www.fda.gov—UCM071436.pdf or at tinyurl.com—y92ahby.

1    Defendants misleadingly claim phytonadione to be the same as vitamin K.  Ex. 6.  This is

2  false.  The vitamin K existing naturally (phylloquinone ) is a different compound altogether from

3  phytonadione.  Phylloquinone (vitamin K1), IUPAC Standard InChIKey:

4  MBWXNTAXLNYFJB-LKUDQCMESA-N:



16  The synthetic substance in Defendants' foods, Phytonadione, IUPAC Standard InChIKey:

17  MBWXNTAXLNYFJB-JHBCSKSVSA-N, has different stereochemistry bonds:



FIRST AMENDED CLASS ACTION COMPLAINT

57.     Vitamin D is added to foods as *ergocalciferol, cholecalciferol, or Vitamin D resins*, all irradiated and synthetic compounds.  21 CFR § 205.605(b); U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  They are produced by ultraviolet irradiation of ergosterol isolated from yeast and related fungi and is purified by crystallization, by ultraviolet irradiation of 7-dehydrocholesterol produced from cholesterol, and/or by concentrating irradiated ergosterol and irradiated 7-dehydrocholesterol, which themselves are separated from the reacting materials of the prior two methodologies. 21 C.F.R. § 184.1950(a).

Irradiation is an extremely unnatural process that Defendants admit is unacceptable in their foods.  For example, Defendants admit that "using gamma radiation from nuclear material goes beyond the level of processing necessary to make natural foods."  *See*  Exs. 2, 3.

58.     *Thiamin hydrochloride* is a synthetic compound.  U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995). According to federal regulations, the usual method of preparing thiamin hydrochloride is by linking the preformed thiazole and pyrimidine ring systems. 21 C.F.R. § 184.1875.

Defendants falsely claim that thiamin hydrochloride is the same as vitamin B1.  In fact, the two substances are altogether different compounds.  Vitamin B1 (thiamin chloride) is $C_{12}H_{17}ClN_4OS$.  In comparison, thiamin hydrochloride is $C_{12}H_{18}Cl_2N_4OS$.

59.     *Pyridoxine hydrochloride* is also a synthetic compound.  U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  By federal regulation, it is prepared by chemical synthesis.  21 C.F.R. § 184.1676.  According to HSDB, it is synthesized by the condensation of  cyanoacetamide with ethoxyacetylacetone in the presence of piperidine, 2-butanone-1,4-diol & alpha-methyliminopropionitrile and/or other substances.  U.S. Patent 2,680,743; GRAS Status of Pyridoxine and Pyridoxine Hydrochloride, 47 F.R. 44572-03.  Alternatively, it is synthesized from ethyl pyruvate, ethyl glycinate, & 1,4-diethoxy-2-butanone, and other substances.  U.S. Patent 2,904,551.

Defendants falsely state that pyridoxine hydrochloride is the same as vitamin B6. It is not; the two substances are chemically and molecularly distinct.  Natural B6 complex (pyridoxine)

1   ($C_8H_{11}NO_3$) is a different substance than pyridoxine hydrochloride ($C_8H_{12}ClNO_3$).

2   60.     Vitamin A is added to foods as **_retinyl palmitate_**, which "is prepared by esterifying

3   retinol with palmitic acid." 21 C.F.R. § 184.1930(a)(3). It is a synthetic substance. 21 CFR §

4   205.605(b). Retinyl palmitate, $C_{36}H_{60}O_2$,



19  is chemically different from the natural vitamin A existing in foods, retinol, $C_{20}H_{30}O$.



22

61.     **Beta-carotene** is another synthetic version of natural vitamin A.  21 C.F.R. §
184.1245(a); U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC
Pub. 2933 (Nov. 1995).  It is a food coloring agent.  E160a.  21 C.F.R. § 101.22(a)(4) ("artificial
color" or "artificial coloring").  Beta-carotene is isolated from natural sources using column
chromatography and separation by non-polar solvents such as hexane (a synthetic neurotoxin and
environmental hazard).  Beta-carotene operates on the body differently than natural vitamin A.
For example, some studies indicate that beta-carotene supplementation increases the probability
of lung cancer in cigarette smokers.

Defendants falsely assert in the ingredient list that beta-carotene is vitamin A.  It is not.
Vitamin A (retinol) is $C_{20}H_{30}O$:



Beta-carotene, by contrast, is $C_{40}H_{56}$:



23

62.     ***Ascorbic acid*** is a federally-declared synthetic substance and a chemical preservative. 7 C.F.R. § 205.605(b) (synthetic); U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995) (synthetic); 21 C.F.R. § 182.3013 (chemical preservative).  While the precise production methodology employed by Kashi is not yet known, the classical Reichstein-Grussner method of synthesis starts with reduction of D-glucose to D-sorbitol by hydrogenation over a nickel catalyst.  The sorbitol is partially oxidized by protecting four of the hydroxyl groups with acetone (synthetic) and sulfuric acid (synthetic), and then chemical oxidization to carboxylic acid.  Acid hydrolysis finally yields the ascorbic acid.

Ascorbic acid does not have the same positive health benefits as natural vitamin C.  For example, natural vitamin C is associated with a lower risk of most types of cancer.  Yet evidence from most randomized clinical trials suggests that vitamin C supplementation does not affect cancer risk.

63.     ***Folic acid*** is the synthetically-created chemical N-[4-[[ (2-amino-1,4-dihydro-4-oxo-6-pteridinyl)methyl]amino]benzoyl]-L -glutamic acid. 21 C.F.R. § 172.345(a).   Folic acid differs from natural folate in numerous respects, including shelf-life and bio-availability. Even the molecular structure of folic acid is different from the natural folate.  Folic acid is:



Natural folates have a different chemical structure:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



25

5-Methyltetrahydrofolate

Vitamin and Mineral Requirements in Human Nutrition, by the World Health Organization,

Food and Agriculture Organization of the United Nations, available at

http://tinyurl.com/4xyythz.

64.      Vitamin B12 is added to foods as *cyanocobalamin*, a synthetic compound.  U.S.

International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov.

1995).  It must be produced commercially from cultures of Streptomyces griseus to be safe as a

food additive.  21 C.F.R. § 184.1945, a process that exceeds standards of "minimal processing"

and kitchen chemistry. Cyanocobalamin ($C_{63}H_{88}CoN_{14}O_{14}P$) is chemically and molecularly

distinct from natural vitamin B12 (cobalamin, $C_{62}H_{88}CoN_{13}O_{14}P$), which is found naturally in

animal foods such as fish, liver, poultry, eggs, and milk products. Cyanocobalamin does not give

the human body the full range of vitamin B12 activity found in natural vitamin B12. Unlike

natural vitamin B12, the body converts cyanocobalamin to methylcobalamin and

adenosylcobalamin, leaving the body to enzymatically remove the resulting cyanide, potentially

harmful to those who are deficient in their natural ability to enzymatically remove cyanide.

65.      *Riboflavin* is a synthetic compound.  U.S. International Trade Commission, Synthetic

Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  It is also a food coloring agent.  E101.

66.      *Tocopherols* are chemical preservatives and synthetic substances.  7 C.F.R. § 205.605(b)

(synthetic); 21 C.F.R. § 182.3890 (chemical preservatives). They are produced by molecular

distillation, solvent extraction, or absorption chromatography – processes that exceed kitchen

chemistry.

67.     **Biotin** is a synthetic compound.  U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  According to HSDB, it is synthetically produced using a variety of synthetic and hazardous compounds.

68.     **Zinc oxide** is listed as a synthetic compound in federal regulations.  7 C.F.R. § 205.601(j)(6)(ii).   It is used as a color additive in drugs and cosmetics.  See 21 C.F.R. §§ 73.1991, 73.2991.  Zinc oxide used in commercial purposes is usually produced by chemical synthesis or by vaporizing metallic zinc at extreme high heat.

69.     The **oils** used in the Falsely Labeled Products use more than minimal processing techniques and/or synthetic compounds or pollutants to produce.  **Hexane** is commonly used to make most oils.  Notably, Defendants admit that they use hexane in manufacturing its soy products.  *See* http://tinyurl.com/3mtc63z, also available at http://www.kashi.com/real_food/values_journey and attached as Exhibit 8. According to the USDA, **all soybean oil** is processed with hexane.  Whole soybeans are literally bathed in hexane to separate the oils from the protein.

70.     Hexane is a byproduct of gasoline refining.  It is a neurotoxin and a hazardous air pollutant. See http://www.cdc.gov/niosh/topics/organsolv/ and http://www.epa.gov/ttn/atw/hlthef/hexane.html. It is also a synthetic substance.  U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  To produce the oils used in Defendants' products, factory workers are exposed to this neurotoxin.  Occupational exposure has been linked to nuerological disorders including polyneuropathy, optic nerve atrophy, narcosis, and may contribute to the development of Leber hereditary optic neuropathy, a disease that causes loss of vision.

71.     Defendants admit that some hexane remains in their food products.  *See* Ex. 8.  Plaintiffs do not yet know the full extent of ingredients used in Defendants' products that utilize hexane in production, and is thus unaware of the amount of hexane residues in the Falsely Labeled Products. The European Union has limited the maximum amount of tolerable hexane residues in food to 10 ppm.  One independent test sampled soy ingredients used in other companies' food products and found levels as high as 21 ppm.

FIRST AMENDED CLASS ACTION COMPLAINT

72.    After the oil is removed from the proteins (commonly through hexane extraction), all oils are further processed before they can be added as a food ingredient. *See, e.g.,* 21 C.F.R. § 184.1555(c)(1) (requiring all canola oil to be "***fully*** refined, bleached, and deodorized") (emphasis added). Such processing can include bleaching, deodorization, degumming to remove phosphatides, and alkali refining to remove free fatty acids, colorants, insoluble matter and gums.  Each of these processing steps may use additional synthetic and hazardous compounds such as phosphoric acid, ferric chloride, acid activated bleaching clay, nitrogen gas saturation, sodium hydroxide, and Trysil, a manufactured hydrated silica.

73.    Some oils must undergo specialized processing that fundamentally and chemically alter the natural substance.  For example, ***cottonseed oil*** is chemically refined to remove gossypol, a toxin found in the cotton plant that has been reported to act as a contraceptive.  The FDA permits several chemicals that are not otherwise generally recognized as safe for direct addition to food to be used to delint the cottonseed, including alpha- Alkyl- omega- hydroxypoly- (oxyethylene). 21 C.F.R. § 173.322.  Like many oils, cottonseed oil is often processed with hexane. ***Canola oil*** must be specially processed as it is derived from rape seed, a toxic plant.

74.    ***Fractionated palm kernel oil*** is unnaturally fractionated, altering the oil from its natural liquid state so that it can remain artificially shelf-stable and solid at room temperature.  It is also made with hexane. Fractionated palm kernel oil can use chemical detergents such as sodium lauryl sulphate and magnesium sulphate.  Even when mechanically fractionated, palm kernel oil is often refined, bleached, and deodorized to substantially remove free fatty acids, phopholipids, color, odor and flavor components, and miscellaneous other non-oil materials. Food Chemicals Codex. Committee on Food Chemicals Codex, Food and Nutrition Board, Institute of Medicine. 5th. Washington, DC: National Academy Press p. 316 (2003).

75.    ***High oleic safflower oil*** is bred to contain more oleic acid than what it would contain in its natural state, giving it a greater heat tolerance and longer shelf life than what it would naturally have.  Even when expeller pressed, high oleic safflower oil is extensively processed, often using hazardous or synthetic chemicals (such as hexane, furfural, and phosphoric acid).

FIRST AMENDED CLASS ACTION COMPLAINT

76.     Defendants injected in its Falsely Labeled Products a number of **soy products**, including soy flour, soy grits, soy protein concentrate, textured soy protein concentrate, soy lecithin, soybean fiber, and soy protein isolate.  Among other things, soy products are used to increase protein content without increasing the carbohydrate and fat content, creating a protein, fat, and carbohydrate ratio unlike that of a natural and non-processed protein source.  Defendants also admit they use hexane to extract the oil from the soybean to produce soy protein for their products. *See* Ex. 8.  They also admit that some hexane remains in the food product.  *Id*.

77.     These soy products are all heavily processed to remove the natural "bean" flavor so that the finished "soy" product no longer tastes like soy.  Soy protein products are further refined through unnatural processes, using chemical additives, acid washes, and alkaline solutions.  The residue of hexane-extracted soybeans is chemically cleaned and processed to make soy flour or soy grits.  Soy protein concentrate is manufactured by treating defatted soybean flakes with additional chemicals to unnaturally remove soluble carbohydrates and lower the lectins, trypsin inhibitors, glycinin, B-conglycinin, saponins and oligosaccharides.  Soy lecithin is processed and isolated as a gum after the re-hydration of hexane-extracted soybeans.

78.     Soy protein isolate is so heavily processed that a Technical Advisory Panel addressing the requirements of the Organic Foods Production Act of 1990 concluded that it is a synthetic substance. The spray drying process forms nitrites, which form potent carcinogens.  The alkaline processing forms lysinoalanine, a toxin.  Database of Select Committee on GRAS Substances (SCOGS) Reviews, Soy Protein Isolate.

79.     Other ingredients are commonly used in family kitchens, but require unnatural and severe processes to commercially produce.  For example, **alkalized cocoa** is produced through an unnatural alkalization process that fundamentally alters the natural cocoa by increasing its pH levels and reducing its beneficial flavanol antioxidants.  Defendants have not specified the alkali ingredient used, despite a federal requirement to do so. 21 C.F.R. §§ 163.110-113. The alkali ingredient may also be a synthetic hazardous substance, such as ammonium bicarbonate, ammonium carbonate, sodium hydroxide, or potassium hydroxide. 7 C.F.R. § 205.605; 40 C.F.R. § 116.4; 49 C.F.R. § 172.101 App. A. **Evaporated cane juice** requires extensive processing to

29

extract cane syrup from the sugar cane, including the use of synthetic compounds such as phosphoric acid and calcium hydroxide, both synthetic substances. 7 C.F.R. § 205.605. *Crystalline fructose* also requires extensive processing, such as acid hydrolysis or further processing high fructose corn syrup, fundamentally altering the product from its natural source.  In fact, Plaintiffs are still unaware of what product, e.g., corn, cane sugar, Defendants use to produce their crystalline fructose.

80.     Defendants have concealed the nature, identity, source, and/or method of preparation of additional ingredients, which may also be Unnatural Substances, including, by way of example only: carrageenan (a sulfated polysaccharide); sodium bicarbonate (especially if produced using the more prevalent Solvay process method); uva ursi (which has not been declared to be generally recognized as safe as a direct food additive by the FDA); annatto extract (also a food coloring agent, E160b); coffee extract; casein; whey products (which may include hydrogen peroxide and free D-glutamic acid), including whey caseinate, whey protein concentrate, whey protein isolate, whey, and whey powder; tapioca syrup; malt extract; malt syrup; egg white powder; sesame oil; chocolate liquor; oat syrup solids; malted milk powder; milk protein concentrate; tartaric acid; locust bean gum (a.k.a. carob bean gum); and Defendants' unspecified so-called "natural flavors."

## THE REPRESENTATIONS ARE FALSE, DECEPTIVE, AND MISLEADING

81.     Contrary to Defendants' representations, these Falsely Labeled Products are not "all natural."  All Falsely Labeled Products contain Unnatural Substances.

82.     Defendants' conduct deceived and/or was likely to deceive the public.  Consumers were deceived into believing that the listed Unnatural Substances were natural substances.  The Unnatural Substances were added to the foods, are foreign substances to these foods, are known or suspected toxins, carcinogens, and/or environmental hazards, and are not reasonably expected by consumers to be added to the foods.

83.     Consumers would not know the true nature of the ingredients merely by reading the ingredient label.  Its discovery requires investigation beyond the grocery store and knowledge of

food chemistry beyond that of the average reasonable consumer.  For example, consumers were deceived into believing that Xanthan Gum is a natural ingredient and that Defendants' soy products were naturally produced, and they would not know its true nature without analyzing federal regulations and food chemistry.

84.    The Unnatural Substances injected into the Falsely Labeled Products are not simply trace ingredients.  In some products, the Unnatural Substances constitute one of the ***primary*** ingredients.  For example, in Kashi's GoLean® Chewy Bars, Chocolate Almond Toffee and Cookies n Cream, there is more soy protein isolate than any other ingredient.  Similarly, in Kashi's GoLean® Crunch! Protein & Fiber Bars, the first four ingredients are brown rice syrup, soy protein isolate, evaporated cane juice crystals, and crystalline fructose. *See* Ex. 6.  That is, there is more of each of these Unnatural Substances than ***any*** other ingredient. As another example, in Kashi's GoLean® "7 Grain Waffles," there is more soy protein isolate than all the Kashi Whole Grains & Sesame Flour ***combined***, and there is more evaporated cane syrup than all the Kashi Whole Grains & Sesame Flour ***combined***. *Id.*  Other Unnatural Substances, such as sodium acid pyrophosphate and monocalcium phosphate, are also added to this so-called "all natural" "waffle." *Id.*

**DEFENDANTS' FALSE REPRESENTATIONS THAT HEART TO HEART PRODUCTS CONTAIN "NOTHING ARTIFICIAL," "6 NATURAL ANTIOXIDANTS" AND OTHER DECEPTIVE HEALTH CLAIMS**

85.    Defendants falsely, misleadingly, and deceptively represent that certain "Falsely Labeled Heart to Heart Products" contain "Nothing Artificial" by prominently stating on the product packages that the product contained "Nothing Artificial" including by way of example and without limitation:

    a)  Kashi Heart to Heart® Instant Oatmeal – Apple Cinnamon, Golden Brown Maple, Raisin Spice
    b)  Kashi Heart to Heart® Cereal – Honey Toasted, Oat Flakes & Wild Blueberry Clusters, Warm Cinnamon Oat
    c)  Kashi Heart to Heart® Waffles – Honey Oat
    d)  Kashi Heart to Heart® Crackers – Original, Roasted Garlic

Falsely Labeled Heart to Heart Product packages are attached as Exhibit 9.  Because Defendants

31

1  have discontinued selling some products, altered some products' packaging, or altered some

2  products' formulations, the complete list of Falsely Labeled Heart to Heart Products is not yet

3  known.  This list will be enlarged as discovery proceeds.

4  86.    These misrepresentations are false, deceptive, and misleading. These products contain

5  various types and substantial amounts of Unnatural Substances described above.  *See* Ex. 6.

6  87.    Defendants falsely, misleadingly, and deceptively represent that the Falsely Labeled

7  Heart to Heart Products contain "6 Natural Antioxidants, including Green Tea, White Tea &

8  Grape Seed." For example:



15  *See* Ex. 9.

16  88.    These misrepresentations are false, deceptive, and misleading.  The Falsely Labeled

17  Heart to Heart Products do not contain green tea, white tea, or grape seed.  Instead, these

18  products contain the Unnatural Substances decaffeinated green tea extract, decaffeinated white

19  tea extract, and grape seed extract, a chemical preservative that the FDA has expressly refused to

20  declare as generally safe as a direct food ingredient.  Moreover, green tea, white tea, and grape

21  seed are not antioxidants, though the natural versions of these items contain antioxidants.

22  Finally, the Falsely Labeled Heart to Heart Products do not contain six natural antioxidants, but

23  instead contain synthetic antioxidants, which are Unnatural Substances.  For example, these

24  products contain synthetic vitamin A (beta carotene), synthetic vitamin C (ascorbic acid), and

25  synthetic vitamin E (tocopherols).  *See* Ex. 6.

26  89.    Defendants falsely, misleadingly, and deceptively represent that the Falsely Labeled

27  Heart to Heart Products bring health benefits, such as the cardiovascular benefits, by prominently

28

labeling the front of the product packages as such.  *See* Ex. 9.

90.     These misrepresentations are false, deceptive, and misleading.  The FDA has specifically prohibited Defendants' claim that antioxidants found in tea extracts have cardiovascular benefits due to a lack of credible evidence. Qualified Health Claims: Letter of Denial - Green Tea and Reduced Risk of Cardiovascular Disease (Docket No. 2005Q-0297) May 9, 2006.

91.     The FDA has specifically prohibited as misleading Defendants' claim that 1g of soluble fiber from oats can help "reduce cholesterol."  Defendants' misleading statement deceptively implies that eating Falsely Labeled Heart to Heart Products will reduce cholesterol, though this is not true.

92.     These health claims further do not satisfy federal requirements for health claims.  *See* FDA Guidance for Industry: A Food Labeling Guide, Appendix C, 2008 WL 2155725.

## DEFENDANTS' OTHER FALSE REPRESENTATIONS

93.     Defendants make additional false, misleading, and deceptive representations on the package of the Falsely Labeled Unnatural Products and the Falsely Labeled Heart to Heart Products (collectively, "Falsely Labeled Products"):

### *Identity and Existence of Ingredients*

94.     Defendants falsely, misleadingly, and deceptively represent that an ingredient is the same as a specific naturally-occurring substance, compounding the falsity of their "all natural" misrepresentations.  *See* Ex. 6.

95.     For example, Defendants falsely represent that some of the Falsely Labeled Products contain "alpha tocopherol acetate (natural vitamin E)" and "mixed tocopherols (natural vitamin E)," though these tocopherol substances are not vitamin E, have a different molecular structure from vitamin E, and are synthetic substances, not a natural vitamin.  D-alpha tocopherol acetate $(C_{31}H_{52}O_3)$:



is chemically and molecularly distinct from Vitamin E ($C_{29}H_{50}O_2$):

96.     As another example, Defendants falsely represented leavenings to be "natural leavenings" when they contain potassium bicarbonate, sodium acid pyrophosphate, and monocalcium phosphate, all Unnatural Substances.

97.     Defendants falsely, misleadingly, and deceptively represent that certain substances have characteristics they do not have, or are of a nature or type in which they are not. *See* Ex. 6. For example, Defendants misleadingly represent that many of their Falsely Labeled Products contain "cane juice" or a derivate thereof, when in fact, "cane juice" is not a "juice" at all, but a sugar or a syrup. The FDA has declared this misrepresentation to be misleading. FDA Guidance for Industry: Ingredients Declared as Evaporated Cane Juice; Draft Guidance, October 2009.

98.     Defendants falsely, misleadingly, and deceptively represent that certain ingredients are equivalent to another substance, when it is not. *See* Ex. 6. For example, Defendants misleadingly and deceptively represent that its foods contain "thiamin hydrochloride (vitamin B1)," misleadingly asserting that thiamin hydrochloride is the same as vitamin B1, when in fact the two substances are altogether different compounds.

FIRST AMENDED CLASS ACTION COMPLAINT

*False Descriptions of Products' Flavor, including being "Naturally Sweetened," made with "Real Fruit," and other False Description*

99.     Defendants falsely, misleadingly, and deceptively represent that some of the Falsely Labeled Products contain a certain naturally-occurring flavor when the product contains no ingredient even derived from that item, violating 21 C.F.R. § 101.22(i).  *See* Ex. 6.  For example, in Kashi's Heart to Heart Instant Oatmeal - Golden Brown Maple, there is no ingredient that Defendants claim is even derived from maple or maple syrup.

100.     Defendants falsely, misleadingly, and deceptively represent that some of the Falsely Labeled Products are of a certain naturally-occurring flavor when the product's flavor is from other ingredients.  For example, in Kashi TLC Crunchy Granola Bars Pumpkin Spice Flax, the identity of the "all natural" ingredient that gives this product its "pumpkin spice" flavor remains a mystery.  The product contains nothing that could be claimed to be a flavor derived from pumpkin.  The only ingredient that is derived from pumpkin is pumpkin seeds, which would not provide a "pumpkin" flavor.  Moreover, the granola bar contains more evaporated cane juice crystals, more expeller pressed canola oil, and more soy protein isolate than any pumpkin ingredient.  As another example, in Kashi TLC Soft-Baked Blackberry Graham Bars, the so-called "blackberry filling" is primarily composed of pear juice concentrate, evaporated cane juice, cane juice molasses, and vegetable glycerin.  The only ingredient in the product even derived from blackberry is "blackberry puree."  There is more vegetable glycerin than there is "blackberry puree.  *See* Ex. 6. In Kashi TLC Snack Crackers Honey Sesame, there is more evaporated cane juice crystals than honey.  *Id.*

101.     Defendants falsely, misleadingly, and deceptively represent that some of the Falsely Labeled Products are "naturally sweetened."  *See* Package Labels attached as Exhibit 10.  For example, in Kashi TLC Snack Crackers Honey Sesame, the label misleads consumers to believe that the product is naturally sweetened by honey, though in fact the sweetness comes from evaporated cane juice crystals.  Similarly, in Kashi TLC Chewy Granola Bars Honey Almond Flax, there is more brown rice syrup, more evaporated cane juice crystals, and more evaporated cane juice syrup than there is honey.  *See* Ex. 6

35

102.    Defendants falsely, misleadingly, and deceptively represent that some of the Falsely Labeled Products contain a specific ingredient when the product in fact contains no such ingredient.  *See* Ex. 10.

103.    For example, on the packages of Kashi TLC™ All Natural Soft-Baked Snack Bars, Defendants falsely represented on the package of the Cherry Vanilla cereal bar: "[r]ich Madagascan vanilla beans baked right into our soft-baked dough."  *See* Ex. 10.  In fact, no vanilla beans are in the product – only vanilla extract.  *See* Ex. 6.  Similarly, on the package of the Baked Apple Spice flavor, Defendants falsely claim that the product is  "Naturally Sweetened.  Made with real fruit and wildflower honey for a touch of natural sweetness." *See* Ex. 10.  In fact, there is no "real fruit" in the Falsely Labeled Product. *See* Ex. 6.  The only fruit substance in the product is pear juice concentrate and apple powder.  *Id.*  The sweetness comes not from honey, but from unnatural sweeteners.  *Id.*  There is more evaporated cane juice than any honey ingredient, and there is more tapioca syrup than any honey ingredient.

## LOCATION OF THE MISREPRESENTATIONS

104.    Defendants made the above false, deceptive, and misleading misrepresentations and omissions on the package of the Falsely Labeled Products.  *See* Exs. 5, 9, 10.

105.    Moreover, Defendants prominently represented on the front of the product package that the Falsely Labeled Unnatural Products are "ALL NATURAL."  *See* Ex. 5.  Defendants prominently represented on the front of the product package that the Falsely Labeled Heart to Heart Products contain "Nothing Artificial," "6 Natural Antioxidants, including Green Tea, White Tea & Grape Seed," and bring health benefits.   *See* Ex. 9.

106.    The misrepresentations and omissions were uniform and have actually been communicated to Plaintiffs and to each member of the Class at every point of purchase and consumption.

**DEFENDANTS' DECEPTIVE AND MISLEADING OMISSIONS**

107.    Defendants injected "natural flavor," "natural flavors," or "natural flavoring" in some of the Falsely Labeled Products.  Defendants have concealed from consumers the identity, source, or nature of these ingredients despite consumers' requests.  *See* inquiry and response at www.kelloggs.com/cgi-bin/brandpages/faq/faq.pl?skin=kashi;id=3674, *directed from* http://www.kashi.com/meet_us/faq, http://tinyurl.com/66gvlwm, attached as Exhibit 11.  The possible carcinogenic, toxic, and environmental effects of these "natural flavors" are still unknown to consumers today.

108.    Defendants similarly injected "enzymes" in some of the Falsely Labeled Products.  *See* Ex. 6.  Other than microbial rennet, an Unnatural Substance, Defendants have concealed from consumers the identity, source, or nature of these enzymes.

109.    Defendants deceptively and misleadingly conceal other material facts about the Falsely Labeled Products, including:

a)   That the Falsely Labeled Heart to Heart Products do not reduce cholesterol, support healthy arteries, or promote healthy blood pressure;
b)   The true nature of the Falsely Labeled Product's ingredients;
c)   That the Falsely Labeled Products contain artificial substances, synthetic substances; substances that are synthetically manufactured, or are produced or processed using synthetic ingredients, artificial ingredients, toxins, carcinogens, pollutants, genetically modified organisms, and/or hazardous substances;
d)   That the Falsely Labeled Products are not "natural" under Defendants' publicized definition of "natural,"
e)   That the Falsely Labeled Products are not what a reasonable consumer would consider to be "natural;"
f)   That the Falsely Labeled Product did not contain ingredients claimed, such as natural antioxidants, green tea, white tea, grape seed, or ingredients from the natural source of the flavor claimed;
g)   That ingredients contained in Falsely Labeled Products are added to imitate characteristics of a natural product, such as "freshness," viscosity, taste, texture, mouthfeel, etc., including preservatives, emulsifiers, sequestering agents, acidity regulators, anticaking agents, antifoaming agents, bulking agents, flavor enhancers, glazing agents, humectants, stabilizers, sweeteners, thickeners, etc.;
h)   That ingredients contained in Falsely Labeled Products are added to give an unnaturally long shelf-life and shelf stability to the product;

37

**DEFENDANTS KNEW IT WAS FALSE**

110.    Defendants knew what representations they made regarding the Falsely Labeled Products, as all representations appear on the products' packages.  Defendants also knew what ingredients were added to each product, as (presumably) all product ingredients listed on the product packages and are further disseminated on their websites.

111.    Defendants are governed by and knew the federal regulations that control the labeling of the Falsely Labeled Products, and thus were aware that many of the Unnatural Substances have been federally declared to be synthetic substances and/or require extensive processing to be used as a food ingredient.  Defendants have also retained expert nutritionists, food chemists, and other scientists, and have spent much time and money in developing their own food technologies, such that they were aware that all the Unnatural Substances are not natural by their own definition and by federal regulation.

112.    For example, Defendants knew and publicly declared that Xanthan Gum is not a "Real Food," giving it a thumbs-down rating in its Ingredient Decoder:

👎 XANTHAN GUM: Processed using petrochemicals, this is used to create sticky dough.

Kashi Ingredient Decoder, attached as Ex. 3. Nonetheless, Defendants knowingly added Xanthan Gum to several of its so-called "all natural" foods.

113.    Defendants hold themselves out to the public as trusted experts in the natural food arena. Kashi holds itself out as an expert in nutrition, environmental issues, and in defining the term "natural" in the food industry.  *See* Kashi Yearbook, available at www.kashi.com/meet_us/yearbook and attached as Ex. 4. Kellogg has similarly held itself out as a "trusted leader in creating ethical and responsible marketing standards and ensure that our consumers have access to the information necessary to make informed choices." 2009 Kellogg Corporate Responsibility Report at page 8, available at http://tinyurl.com/4345du2.

114.    Defendants thus knew all the facts demonstrating that its Falsely Labeled Products contain Unnatural Substances and that these products are falsely labeled.

38

**DEFENDANTS FRAUDULENTLY CONCEALED THEIR WRONGS,
TOLLING THE STATUTE OF LIMITATIONS**

115.    Plaintiffs, by and through their attorney, discovered Defendants' wrongs in February,
2011, through investigation of the food production processes of the Unnatural Substances and the
packages of the Falsely Labeled Products.  Plaintiffs and the members of the Class are not at
fault for failing to discover the Defendants' wrongs earlier, and had no actual or presumptive
knowledge of facts sufficient to put them on inquiry.

116.    To this day, Defendants have concealed and suppressed the true nature, identity, source,
and method of production of the ingredients in the Falsely Labeled Products despite consumers'
inquiry attempts.  Defendants have also concealed and suppressed the true nature, identity,
source, and method of production of the "natural flavors," "enzymes," and other ingredients in
the Falsely Labeled Products despite consumers' inquiry attempts.

117.    The production process Defendants use for these ingredients is known only to
Defendants, and Defendants have refused to disclose such information to Plaintiffs and the Class.
These facts are not ascertainable and are still not known to Plaintiffs, the Class, and to the
reasonable consumer.  Defendants' concealment tolls the applicable statute of limitations.

118.    In the alternative, Plaintiffs allege that Defendants Kashi, DeSouza, and Does 1 through
100 engaged in the wrongful acts complained of within the applicable four-year statute of
limitations, and that Defendants Kellogg and Denholm engaged in the wrongful acts complained
of within the applicable six-year statute of limitations.


**DEFENDANTS INTENDED CONSUMERS RELY**

119.    Defendants made the false, deceptive, and misleading representations and omissions,
intending Plaintiffs and Class members to rely upon these representations and omissions in
purchasing and ingesting one or more Falsely Labeled Products.  In making the false,
misleading, and deceptive representations and omissions, Defendants knew and intended that
consumers would pay a premium for "all natural" products over comparable products that are not
"all natural," and would pay a premium for products that provide natural antioxidants and

39

cardiovascular health benefits over comparable products that do not, furthering Defendants'
private interest of increasing sales for its products and decreasing the sales of the all-natural
products that are truthfully offered by Defendants' competitors.

120.    Hoping to further influence consumers' purchasing decisions even outside the grocery
store or kitchen pantry, Defendants offered the "Kashi Ingredient Decoder,$^{TM}$" expressly inviting
consumers to print the Decoder and bring it with them to the grocery store, or to "view [it] on
your phone at kashi.com" so that consumers could refer to Defendants' representations "anytime
and anyplace." Kashi Online Ingredient Decoder, available at
www.kashi.com/real_food/ingredients; Kashi Pdf Ingredient Decoder, available at
www.kashi.com/pdf/Kashi_Ingredient_Decoder.pdf and attached as Exhibit 2; Kashi Ingredient
Decoder, as appearing in the May 2011 issue of Real Simple, pp. 264-265, and attached as
Exhibit 3.

## CONSUMERS REASONABLY RELIED

121.    Consumers frequently rely on food label representations and information in making
purchase decisions.

122.    When Plaintiffs and the Class members purchased the Falsely Labeled Products,
Plaintiffs and the Class members saw the product packages and thus also saw the false,
misleading, and deceptive representations detailed above, and did not receive disclosure of the
facts concealed as detailed above.

123.    Plaintiffs and the Class members were among the intended recipients of Defendants'
deceptive representations and omissions.

124.    Plaintiffs and the Class members reasonably relied to their detriment on Defendants'
misleading representations and omissions.

125.    Defendants' false, misleading, and deceptive misrepresentations and omissions deceived
and misled, and are likely to continue to deceive and mislead, Plaintiffs, Class members,
reasonable consumers, and the general public.

126.    Plaintiffs and Class members were further deceived and misled by Defendants' failure to

disclose the above-listed material facts.  Defendants' misleading affirmative statements further obscured what Defendants failed to disclose.  Thus, reliance upon Defendants' misleading and deceptive representations and omissions may be presumed.

127.    Defendants made the deceptive representations and omissions on the Falsely Labeled Product labels with the intent to induce Plaintiffs' and the Class members' purchase of the Falsely Labeled Products, Plaintiffs' and the Class members' reliance upon such representations and omissions may be presumed.

128.    Defendants' deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions, Plaintiffs' and the Class members' reliance upon such representations and omissions may be presumed as a matter of law.  The materiality of those representations and omissions also establishes causation between Defendants' conduct and the injuries sustained by Plaintiffs and the Plaintiff Class.

**DEFENDANTS' WRONGFUL CONDUCT CAUSED PLAINTIFFS' INJURY**

129.    As an immediate, direct, and proximate result of Defendants' false, misleading, and deceptive representations and omissions, Defendants injured Plaintiffs and Class members in that they:

a) paid a sum of money for a product that was not as represented;
b) paid a premium price for a product that was not as represented;
c) were deprived the benefit of the bargain because the Falsely Labeled Products they purchased were different than what Defendants warranted;
d) were deprived the benefit of the bargain because the Falsely Labeled Products they purchased had less value than what was represented by Defendants;
e) did not receive a product that measured up to their expectations as created by Defendants;
f) ingested a substance that was other than what was represented by Defendants;
g) ingested a substance that Plaintiffs and the members of the Class did not expect or consent to;
h) ingested a product that was artificial, synthetic, or otherwise unnatural;
i) ingested a product that did not bring the health benefits Defendants promised;
j) ingested a substance that is generally harmful to their health, their children's health, or their unborn fetus's health;
k) ingested a substance that is, contains, or is produced by a known or suspected toxin, carcinogen, hazardous substance, poses health or environmental risks, or otherwise is

harmful to the environment and/or the factory workers that produce or process such
substances;

l)  ingested a substance that was of a lower quality than what Defendants promised;
m)  were denied the benefit of knowing what they ingested;
n)  were denied the benefit of truthful food labels;
o)  were forced to unwittingly support an industry that contributes to environmental,
ecological, or health damage;
p)  were denied the benefit of supporting an industry that sells all-natural foods and
contributes to environmental sustainability;
q)  were denied the benefit of the beneficial properties of the all-natural foods promised.

130.    Had Defendants not made the false, misleading, and deceptive representations and
omissions, Plaintiffs and the Class members would not have been injured.  Among other things,
they would not have been denied the benefit of the bargain.  They would not have ingested a
substance that they did not expect or consent to.  They would not have been forced unwittingly to
support an industry that contributes to environmental damage.  They would not have suffered the
other injuries listed above.  Accordingly, Plaintiffs and the Class members have suffered injury
in fact as a result of Defendants' wrongful conduct

131.    Plaintiffs and the Class members all paid money for the Falsely Labeled Products.
However, Plaintiffs and the Class members did not obtain the full value of the advertised
products due to Defendants' misrepresentations and omissions.  Plaintiffs and Class members
purchased, purchased more of, or paid more for, the Falsely Labeled Products than they would
have had they known the truth of the products.  Accordingly, Plaintiffs and the Class members
have suffered injury in fact and lost money or property as a result of Defendants' wrongful
conduct.

## DEFENDANTS BENEFITTED FROM THEIR MISLEADING AND DECEPTIVE REPRESENTATIONS AND OMISSIONS

132.    As the intended, direct, and proximate result of Defendants' false, misleading, and
deceptive representations and omissions, Defendants have been unjustly enriched through more
sales of Falsely Labeled Products and higher profits at the expense of Plaintiffs and the Class.
As a direct and proximate result of their deception, Defendants also unfairly hold other benefits,
including the higher value of an "all natural foods" brand and resulting higher stock value.

42

**KELLOGG**

133.    Kellogg actively and directly made the alleged false, misleading, and deceptive representations and omissions, and directed or participated in Kashi's false, misleading, and deceptive representations and omissions.

134.    Kashi's product marketing and packaging are under Kellogg's direct orders, direction, control, and consent.  Kellogg has paid for much of Kashi's marketing budget.  Kellogg guides and controls Kashi's product packaging also through Kellogg's Worldwide Marketing and Communication Guidelines ("WWMCG"), which is designed to ensure uniform standards and forms the basis for all Kellogg's and Kashi's consumer communications.

135.    Kellogg directly assists Kashi in research and development, sales, category expertise, and their co-manufacturing network. Kellogg actively controls and directs Kashi's other business decisions, including Kashi product recalls.

136.    Kellogg also actively and directly develops, formulates, and selects the ingredients in Kashi's Falsely Labeled Products.  Kellogg's practice is to spearhead product innovation and reformulations. At its Global Research and Development headquarters and its World-Wide Research and Development Centers, Kellogg evaluates its existing products and those in the development pipeline for ways to improve their "nutritional profiles."

137.    Kellogg directs, vets, and approves each supplier of ingredients used in Kashi's products. Kellogg directly manages and selects suppliers, enforces its raw material ingredient requirements and enforces its quality management protocols, including the "Kellogg Code of Conduct for Manufacturers," Kellogg's "Responsible Sourcing Framework," and its "Global Supplier Code of Conduct."  Kellogg tests and guarantees the quality of its products under its Quality Assurance and Quality Control Tests.

138.    After Kellogg acquired Kashi in 2000, Kellogg introduced new Kashi product lines using Kellogg's food innovations, including Heart to Heart® products in 2001, frozen entrees in 2007, and TLC® products in 2002, 2005, 2006, 2007, 2008, and 2009.  Kellogg continues to introduce new Kashi products, such as TLC® Pita Crisps in 2011.  Kellogg has publicly taken credit for being responsible for introducing Kashi waffles, cereal, and other Kashi lines.

43

139.    Kellogg owns the trademarks and brands of Kashi, "Seven Whole Grains on a Mission," GoLean, and TLC.  Kellogg thus unfairly benefitted from its deceptive acts, enjoying inflated valuation and stock prices.

140.    Kellogg's control over Kashi also benefitted Kellogg's other business units and brands. For example, Kashi's products help attract consumers to Kellogg's other like-minded brands, such as Bear Naked.

141.    Kellogg warrants its products meets Kellogg's own quality standards, stating "[w]e have extensive systems and processes in place to ensure that our foods meet our own strict quality and safety standards, as well as government regulations."  2010 Kellogg Corporate Responsibility Report, Marketplace: Product Quality and Food Safety.


## CLASS ACTION ALLEGATIONS

142.    Plaintiffs bring this action on behalf of themselves and on behalf of all other Class members defined as all consumers residing in the United States who purchased in the United States Falsely Labeled Products, as defined above.

143.    Excluded from the Class are: (1) Defendants; (2) any entity in which any Defendant has a controlling interest; (3) the legal representatives, officers, directors, assigns, and successors of any Defendant; (4) the Judge to whom this case is assigned and any member of the Judge's immediate family; (5) all consumers, if any, who received a full refund from Defendants for their purchase of Falsely Labeled Products due to the facts alleged herein; and (6) all claims for personal injury, wrongful death, or any incidental damages over and above those sought herein, except as authorized by law.

144.    Plaintiffs bring this Class pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

145.    Upon information and belief, there are thousands of Class members who are geographically dispersed throughout the United States.  Individual joinder of all Class members would be impracticable.

146.    Numerous common questions of law or fact exist as to all Class members. These

44

questions predominate over the questions affecting only individual class members. These

common legal or factual questions include, but are not limited to:

a) Whether Defendants' labeling of the Falsely Labeled Products is false, misleading, or deceptive;
b) Whether one or more of the ingredients used in the Falsely Labeled Products is unnatural or artificial;
c) Whether Defendants failed to disclose material facts regarding the Falsely Labeled Products;
d) Whether Defendants had a duty to Plaintiffs and the Class to disclose the material facts regarding the Falsely Labeled Products;
e) Whether Defendants violated California law, federal law, and/or common law;
f) Whether Defendants knew the true nature of the ingredients in the Falsely Labeled Products;
g) Whether Class members have a right to damages, restitution, or other legal or equitable remedy by virtue of Defendants' violations of law;
h) Whether Class members have the right to declaratory or injunctive relief.

147.   Plaintiffs' claims are typical of the claims of the Class because they are based on the same factual, legal, and remedial theories as the claims of the Class.

148.   Plaintiffs will fairly and adequately represent and protect the interests of the Class because Plaintiffs are similarly situated with, and have suffered similar injuries as, the members of the Class they seek to represent.  Plaintiffs feel that they have been deceived, wish to obtain redress of the wrong, and want Defendants stopped from perpetrating similar wrongs on others. Plaintiffs are adequate representatives of the Class also because their interests do not conflict with the interests of the class members they seek to represent, and they have retained counsel competent and experienced in conducting complex class action litigation, who led the investigation uncovering Defendants' wrongs, who were the first to publicly uncover Defendants' wrongs, who have no interests adverse to those of the class, and who can and will vigorously prosecute this litigation.

149.   Certification of the Class under Rule 23(b)(1) is appropriate because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants, whose product sales and product marketing efforts are on a nation-wide scale.

FIRST AMENDED CLASS ACTION COMPLAINT

150.   Certification of the Class under Rule 23(b)(2) is also appropriate because Plaintiffs seek injunctive and declaratory relief as detailed below.  Defendants acted in the same manner toward the entire class by marketing, representing, and selling the Falsely Labeled Products through unlawful, deceptive, fraudulent, and otherwise wrongful methods, thereby making appropriate preliminary and final equitable relief with respect to the Class.

151.   Certification of the class under Rule 23(b)(3) is also appropriate insofar as damages are sought.  The questions of law and fact common to the Class members predominate over any questions affecting only individual members.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy, in that:

   a) consumers cannot effectively prosecute separate actions for their individual purchases of the Falsely Labeled Products;
   b) concentration of the litigation concerning this matter in this Court is desirable; and
   c) the class is of a moderate size and the difficulties likely to be encountered in the management of a class action are not great.

152.   A class action is superior to other available means for the fair and efficient adjudication of this dispute:

   a) Common questions of law and fact predominate over any individual questions that may arise.
   b) No member of the Class has a substantial interest in individually controlling the prosecution of a separate action.  The damages suffered by each individual class member likely will be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct. Thus, it would be virtually impossible for the class members individually to effectively redress the wrongs done to them.
   c) Upon information and belief, there are no pending lawsuits concerning this controversy.
   d) It is desirable to concentrate the litigation of these claims in this forum since the acts complained of took place in this district and this forum is convenient to the parties, the class members, and the potential witnesses.  The resolution of the claims of all Class members in a single forum, and in a single proceeding, would be a fair and efficient means of resolving the issues raised in this litigation.
   e) Prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants.
   f) The class is specifically identifiable to facilitate provision of adequate notice and there will be no significant problems managing this case as a class action.

46

FIRST AMENDED CLASS ACTION COMPLAINT

**FIRST CLAIM**
**(Unlawful Business Practices: Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, et seq.)**
**Brought by Plaintiffs and the Putative Class Against All Defendants**

153.     The allegations in each Cause of Action are repeated and realleged in every other Cause of Action as if set forth in full therein.

154.     Defendants have engaged and continue to engage in unlawful, unfair, or fraudulent business practices within the meaning of Cal. Bus. & Prof. Code § 17200, causing injury to Plaintiffs and the Class.

155.     Plaintiffs have standing to pursue this claim as he has suffered injury in fact and has lost money or property as a result of Defendants' actions as set forth above.  Class members also have suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth above.

156.     The violation of any law constitutes an "unlawful" business practice under Cal. Bus. & Prof. Code § 17200.

157.     Each Defendants' false representations alleged herein violates 21 U.S.C. § 343; 21 U.S.C. § 331; Cal. Civ. Code § 1709; Cal. Civ. Code § 1750 *et seq.*; Cal. Com. Code § 2313; Cal. Com. Code § 2315; and Cal. Bus. & Prof. Code § 17500 *et seq.*

158.     Each Defendants' false representations alleged herein also violates California's criminal laws.  Cal. Penal Code § 383 (forbidding the offering for sale food that is adulterated, e.g., "by any means it is made to appear better or of greater value than it really is").

159.     Each Defendants' false representations alleged herein also violates California's Sherman Food, Drug, and Cosmetic Law, which prohibits the advertising, manufacture, sale of adulterated and misbranded foods.   Cal. Health & Safety Code §§ 110390, 110395, 110398, 110400, 110550, 110585, 110620, 110625, 110660, 110705, 110740, 110760, 110765, and 110770.

160.     In addition to violating the statutes listed in the above paragraphs, Kellogg also violated Michigan's Penal Code.  Mich. Comp. Laws Ann. § 750.33 (false, deceptive, or misleading advertising is misdemeanor punishable by one-year imprisonment).

FIRST AMENDED CLASS ACTION COMPLAINT

161.    Kellogg also violated the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901 *et seq.*, the Michigan False Advertising Act, Mich. Comp. Laws Ann. § 445.356 *et seq.*, and Michigan's Food Law of 2000.  Mich. Comp. Laws Ann. §§ 289.5101(1)(a), (e); 289.5103; 289.5105. Each day of Kellogg's violation is a separate violation under these statutes.  Mich. Comp. Laws Ann. § 289.5101(2).  Each violation is a misdemeanor punishable by up to 90 days' imprisonment.  Mich. Comp. Laws Ann. § 289.5107.

162.    By violating these laws, Defendants engaged in unlawful business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, causing injury to Plaintiffs and the Putative Class.

**SECOND CLAIM**
**(Unfair Business Practices under the Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, et seq. and the Consumer Protection Act,**
**Mich. Comp. Laws Ann. § 445.901 et seq.)**
**Brought by Plaintiffs and the Putative Class Against All Defendants**

163.    Defendants have engaged and continue to engage in unfair business practices within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq.* and Mich. Comp. Laws Ann. § 445.901 *et seq.*, causing injury to Plaintiffs and the Putative Class.

164.    Through each of the false and misleading representations and omissions detailed more fully in the preceding paragraphs, Defendants have engaged and continue to engage in conduct that is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. Defendants' false and misleading representations and omissions also violate legislatively declared policy as they have violated numerous state and federal laws. Moreover, the gravity of the harm to Plaintiffs and Class members resulting from Defendants' conduct outweighs Defendants' legitimate reasons, justifications and/or motives for engaging in such deceptive acts and practices.

**THIRD CLAIM**
**(Fraudulent Business Practices: Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, et seq.)**
**Brought by Plaintiffs and the Putative Class Against All Defendants**

165.    Defendants have engaged and continue to engage in fraudulent business practices within the meaning of Cal. Bus. & Prof. Code § 17200, and Mich. Comp. Laws Ann. § 445.901 *et seq.*, causing injury to Plaintiffs and the Putative Class.

166.    Each false and misleading representation and omission constitutes fraudulent business

48

practices under Cal. Bus. & Prof. Code § 17200 and Mich. Comp. Laws Ann. § 445.901 *et seq.*, because the representations and omissions were false. Even if these representations were true, Defendants' representations and deceptive concealment were nonetheless fraudulent under the statute because they were misleading and were likely to and did deceive the reasonable consumer, including Plaintiffs and the Class members.

**FOURTH CLAIM**
**(False Advertising: Cal. Bus. & Prof. Code § 17500, *et seq.*,**
**Mich. Comp. Laws Ann. § 445.356)**
**Brought by Plaintiffs and the Putative Class Against All Defendants**

167. Defendants engaged in and disseminated advertising, including product package labels, television advertisements, magazine advertisements, internet advertisements, and other marketing from the State of California to the public and offered for sale Falsely Labeled Products on a nationwide basis, including in California.

168. The misrepresentations and non-disclosures by Defendants of the material facts detailed above constitute false and misleading advertising, and therefore constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

169. Defendants' false and misleading advertising also disseminated from Kellogg's home state, Michigan. Thus, Defendants have also violated Michigan's deceptive advertising statute. Mich. Comp. Laws Ann. § 445.356.

**FIFTH CLAIM**
**(Violation of California's Consumer Legal Remedies Act ("CLRA"),**
**Cal. Civ. Code § 1750 *et seq.*)**
**Brought by Plaintiffs and the Putative Class Against All Defendants**

170. Plaintiffs bring this action pursuant to California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.* and seek to enjoin the unfair, unlawful, and deceptive acts and conduct of the Defendants as more fully described above.

171. Defendants' false and fraudulent representations and omissions have violated, and continue to violate the CLRA because they extend to transactions that are intended to result, or have resulted, in the sale of goods to consumers, including the Plaintiffs and the Class members.

172. Defendants' conduct violates Cal. Civ. Code § 1770(a)(5), which prohibits "[r]epresenting that goods . . . have . . . characteristics [or] ingredients . . . which they do not

49

have," and Cal. Civ. Code § 1770(a)(7), which prohibits: "[r]epresenting that goods . . . are of a particular standard, quality, or grade . . . if they are of another," causing injury to Plaintiffs and the Putative Class.

173.    Defendants are "person[s]" under Cal. Civ. Code § 1761(c). Plaintiffs and the Class members of are aggrieved "consumers" under Cal. Civ. Code § 1761(d). The Falsely Labeled Products are "goods" under Cal. Civ. Code § 1761(a). Plaintiffs' and the Class members' purchases of the Falsely Labeled Products are "transactions" under Cal. Civ. Code § 1761(e) and § 1770.

174.    Plaintiffs served Defendants with notice of their CLRA violations by certified mail, return receipt requested.  After thirty days of receiving the notice, Defendants still failed to provide any relief for their CLRA violations.

175.    Plaintiffs and the Class members seek punitive damages, preliminary injunctive relief, and permanent injunctive relief against Defendants' unfair and deceptive acts and conduct.

**SIXTH CLAIM**
**(Restitution Based On Quasi-Contract/Unjust Enrichment)**
**Brought by Plaintiffs and the Putative Class Against Kashi and Kellogg**

176.    As a result of Kashi's and Kellogg's wrongful, unfair and deceptive conduct, Plaintiffs and the Class members have suffered a detriment while Kashi and Kellogg have received a benefit, as detailed above.

177.    Kashi and Kellogg have unjustly retained these benefits, and thereby have been unjustly enriched as a result of the deceptive representations and omissions alleged herein at the expense of Plaintiffs and the Class members, thereby creating a quasi-contractual obligation on Kashi and Kellogg to restore these ill-gotten gains to Plaintiffs and the Class.

178.    Under principles of equity and good conscience, Kashi ad Kellogg should not be allowed to retain the money generated from the sale of the Falsely Labeled Products, which were unlawfully marketed, advertised, labeled, promoted, and sold to the Plaintiffs and Class members.  To allow Kashi and Kellogg to retain the monies received from Plaintiffs and the Class members would offend traditional notions of justice and fair play and induce companies to

misrepresent key characteristics of their food products in order to increase sales.

179.     As a direct and proximate result of Kashi's and Kellogg's unjust enrichment, Plaintiffs and the Class members are entitled to restitution or restitutionary disgorgement in an amount to be proved at trial.  The amount of restitution to which Plaintiffs and the Plaintiff Class are entitled should be measured by the extent of Kashi's and Kellogg's unjust enrichment, including its unjustly acquired profits and other monetary benefits resulting from its wrongful conduct.

**SEVENTH CLAIM**
**(Breach of Express Warranty, under State and Federal Law)**
**Brought by Plaintiffs and the Putative Class Against Kashi and Kellogg**

180.     Defendants Kashi and Kellogg expressly warranted to Plaintiffs and members of the Class on the package of the Falsely Labeled Products those representations listed above.

181.     These express warranties appear on each and every package of the Falsely Labeled Products.  These affirmations of fact or promises by Defendants Kashi and Kellogg relate to the good and became part of the basis of the bargain.

182.     Plaintiffs and members of the Class purchased the Falsely Labeled Products, believing them to conform to the express warranties.

183.     Defendants Kashi and Kellogg breached the express warranties contained on the package of their Falsely Labeled Products.

184.     As a direct and proximate result of Kashi's and Kellogg's breach of express warranties, Plaintiffs and the Class members did not receive goods as warranted.  Plaintiffs and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial.  Among other things, Plaintiffs and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above.  Moreover, had Plaintiffs and the Class members known the true facts, they either would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price Defendants charged for the products.

FIRST AMENDED CLASS ACTION COMPLAINT

**EIGHTH CLAIM**
**(Breach of Implied Warranty of Merchantability, under State and Federal Law)**
**Brought by Plaintiffs and the Putative Class Against Kashi and Kellogg**

185.    Defendants Kashi and Kellogg impliedly warranted that the Falsely Labeled Products conformed to the promises or affirmations of fact made on the product labels detailed above. Kashi and Kellogg thereby impliedly warranted that the products were merchantable.  Kashi and Kellogg did so with the intent to induce Plaintiffs and the Class members purchase the Falsely Labeled Products.

186.    Kashi and Kellogg breached their implied warranties in that the products did not comply with the promises and affirmations of fact made on the product labels detailed above.

187.    Kashi and Kellogg had prior knowledge and notice of the true nature of the Falsely Labeled Products and, therefore, its breach of the warranty, but took no action to remedy the inferiority or to cure the breach.

188.    As a direct and proximate result of Kashi's and Kellogg's' breach of the implied warranty merchantability, Plaintiffs and the Class members did not receive goods as impliedly warranted by Defendants to be merchantable.  Plaintiffs and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial.  Among other things, Plaintiffs and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above.  Moreover, had Plaintiffs and the Class members known the true facts, they either would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price Defendants charged for the products.

**NINTH CLAIM**
**(Fraudulent Misrepresentation, Fraudulent Concealment, and Constructive Fraud**
**in Violation of Common Law and Cal. Civ. Code §§ 1709, 1573 *et seq.*)**
**Brought by Plaintiffs and the Putative Class Against All Defendants**

189.    On the package of the Falsely Labeled Products, Defendants falsely and fraudulently represented to the public, including Plaintiffs and Class Members, those false representations listed above.  Defendants also fraudulently concealed from the public, including Plaintiffs and Class Members, those material facts listed above.  These misrepresentations and omissions constitute deceit under Cal. Civ. Code § 1710.

190.    Defendants knew that these misrepresentations are false and that their omissions are fraudulent and deceptive, but nonetheless misrepresented and concealed these facts to induce Plaintiffs and the Class members to act in reliance on the misrepresentations and omissions and purchase the Falsely Labeled Products.

191.    Defendants intentionally made the false representations and intentionally concealed and suppressed these material facts with the intent to defraud the Plaintiffs and the Class.  Defendants made these false representations and omissions to make the Falsely Labeled Products appear more attractive to consumers.  Defendants knew and intended that Plaintiffs and the members of the Class would rely on Defendants' representations and omissions and purchase the Falsely Labeled Products. Defendants thereby violated Cal. Civ. Code § 1709.

192.    Defendants were under a duty to disclose the omitted facts because (1) Defendants had a duty to correct the misinformation Defendants disseminated through advertising, marketing, and other promotion of the Falsely Labeled Products; and (2) Defendants were in possession of knowledge about the identity, formulation, and production of the Falsely Labeled Products and of the Unnatural Substances, and this information was not reasonably available to consumers.

193.    By not disclosing the material facts to Plaintiffs and other members of the Class, Defendants breached this duty.

194.    Defendants gained an advantage by these fraudulent representations and omissions.

195.    These misrepresentations and omissions were material.  A reasonable person would attach importance to the existence or nonexistence of these representations in determining whether to purchase the Falsely Labeled Products.

196.    Plaintiffs and the members of the Class necessarily, reasonably, and justifiably relied upon the Defendants' false representations and misleading omissions.  Plaintiffs and the other Class members were unaware of the truth of these misrepresentations and these concealed facts and would have not acted as they did had they known the truth.

197.    Defendants made these fraudulent misrepresentations and omissions uniformly to each Class Member, by placing the same misrepresentation and omission prominently on each and every package of the Falsely Labeled Products.  Thus, Plaintiffs and each Class member were

53

1   subjected to the same fraudulent advertising each time they purchased and ingested the Falsely

2   Labeled Products.

3   198.    As a direct and proximate result of Defendants' fraud, Plaintiffs and the Class members

4   suffered actual damages in an amount not presently known, but which will be shown by proof at

5   time of trial, including incidental and consequential damages, emotional distress and mental

6   anguish, interest, and reasonable attorneys' fees.

7   199.    Plaintiffs are informed and believe, and upon such information and belief allege, that

8   Defendants undertook the aforesaid illegal acts intentionally or with conscious disregard of the

9   rights of Plaintiffs and the Class, and did so with fraud, oppression, and malice. Therefore,

10  Plaintiffs and the Class are also entitled to punitive damages against Defendant.

11                                **TENTH CLAIM**
                        **(Negligence and Negligent Misrepresentations)**
12          **Brought by Plaintiffs and the Putative Class Against All Defendants**

13  200.    Defendants had a duty to use due care in formulating, labeling, marketing, advertising,

14  and selling its products.  Defendants breached that duty.  Defendants' false and misleading

15  representations detailed above were negligently made without any reasonable grounds for

16  believing it was true.

17  201.    Defendants made the negligent misrepresentations intending to induce consumers'

18  reliance on the facts misrepresented and matters concealed.  Plaintiffs and other consumers saw,

19  believed, and relied on Defendants' misrepresentations and, in justifiable reliance on them and as

20  a result of them, purchased the Falsely Labeled Products.

21  202.    Defendants are also negligent due to their violation of statutes and regulations referenced

22  above.  Their violation proximately caused Plaintiffs and Class member's injury, their injury

23  being the type that the statutes and regulations were designed to prevent, and these consumers

24  being within the class of persons for whose protection the statutes and regulations were adopted.

25  203.    As a proximate and actual result of Defendants' negligence and negligent representations,

26  Plaintiffs and the Class have suffered damages in an amount not presently known, but which will

27  be shown by proof at time of trial, including incidental and consequential damages, physical

28  injury, medical monitoring, interest, and reasonable attorneys' fees.

                                                            FIRST AMENDED CLASS ACTION COMPLAINT

**ELEVENTH CLAIM**
**(Strict Liability for Defective Product)**
**Brought by Plaintiffs and the Putative Class Against All Defendants**

204.    Defendants are in the business of manufacturing, processing, distributing, selling, and advertising food products, such as the Falsely Labeled Products, for consumption by the general public.  Defendants caused these Falsely Labeled Products to be placed into the stream of commerce and sold to the Plaintiffs and other Class members while said products were defective.

205.    Plaintiffs purchased and ingested Falsely Labeled Products on numerous occasions, doing so in a manner that was reasonably foreseeable and intended by Defendants at the time the products were manufactured, processed, distributed, and sold to Plaintiffs and Class members.

206.    The Falsely Labeled Products were defective and unreasonably dangerous because such products were in a condition not anticipated by the consumer.

207.    The Falsely Labeled Products were defective also because the Unnatural Substances would not be reasonably expected in the product.

208.    The Falsely Labeled Products were defective also in that the labeling of the Falsely Labeled Products violated statutes and regulations referenced above.

209.    The defective condition existed at the time the product left the Defendants' control and, further, Defendants knew or reasonably should have known of the condition at that time.

210.    As a proximate and actual result of the defective condition, Plaintiffs and the Class members have suffered damages in an amount not presently known, but which will be shown by proof at time of trial, including incidental and consequential damages, physical injury, medical monitoring, interest, and reasonable attorneys' fees.

**TWELFTH CLAIM**
**(Assault and Battery)**
**Brought by Plaintiffs and the Putative Class Against All Defendants**

211.    Defendants intended to and induced Plaintiffs and the Class members to ingest the Falsely Labeled Products. Defendants thereby violated the Plaintiffs' and the Class members' person.

212.    Plaintiffs and the Class members did not know all material facts regarding the Falsely Labeled Products. Plaintiffs and the Class members therefore did not consent to the bodily

55

intrusion.

213.    Plaintiffs and the Class members were offended and injured by Defendants' conduct.

Plaintiffs and the members of the Class:

    a) ingested a substance that was other than what was represented by Defendants;
    b) ingested a substance that Plaintiffs and the members of the Class did not expect or consent to;
    c) ingested a product that was artificial, synthetic, or otherwise unnatural;
    d) ingested a product that did not bring the health benefits Defendants promised;
    e) ingested a substance that is generally harmful to their health, their children's health, or their unborn fetus's health;
    f) ingested a substance that is, contains, or is produced by a known or suspected toxin, carcinogen, hazardous substance, poses health or environmental risks, or otherwise is harmful to the environment and/or the factory workers that produce or process such substances;
    g) ingested a substance that was of a lower quality than what Defendants promised;

214.    Plaintiffs and the Class members also suffered imminent apprehension of being injured by Defendants' Falsely Labeled Products.

215.    Defendants acted with wanton, willful, and reckless disregard for Plaintiffs' and the Class members' rights.

216.    As a direct and proximate result of Defendants' assault and battery, Plaintiffs and the Class members have suffered actual damages in an amount not presently known, but which will be shown by proof at time of trial, including incidental and consequential damages, emotional distress and mental anguish, interest, and reasonable attorneys' fees.

217.    Plaintiffs are informed and believe, and upon such information and belief allege, that Defendants undertook the aforesaid illegal acts intentionally or with conscious disregard of the rights of Plaintiffs and the Class, and did so with fraud, oppression, and malice. Therefore, Plaintiffs and the Class are also entitled to punitive damages against Defendant.

### THIRTEENTH CLAIM
#### (Conspiracy)
**Brought by Plaintiffs and the Putative Class Against All Defendants**

218.    In committing the wrongful acts alleged herein, Defendants planned and participated in and furthered a common scheme by means of false, misleading, deceptive, and fraudulent representations and omissions to induce Plaintiffs, Class members, and members of the public to

purchase one or more Falsely Labeled Products.

219.    Defendants, upon becoming involved with the manufacture, distribution, advertising, marketing, and sale of the Falsely Labeled Products knew or should have known that the claims about these products are false, deceptive, and misleading.

220.    In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and knowingly assisted each other in breach of their respective duties and obligations as herein alleged.

## PRAYER

221.    As a result of the conduct described above, Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiffs and Class members.  Defendants have been unjustly enriched by the profits they have obtained from Plaintiffs and the Class from the purchases of Falsely Labeled Products made by them, and the higher value of an "all natural foods" brand.

222.    As a result of the wrongful business practices described above, Plaintiffs and the members of the Class are entitled to an order awarding Plaintiffs and the Class full restitution and restoration of the money wrongfully acquired by Defendants by means of their deceptive misrepresentations and omissions, in an amount to be proven at trial, plus interest and attorneys fees, injunctive relief, and any other orders and judgments which may be necessary to disgorge Defendants' profits or ill-gotten gains obtained and to restore any person in interest any money paid for the Falsely Labeled Products as a result of the wrongful conduct of Defendants. Otherwise, the Class will continue to be harmed by Defendants' deceptive acts and practices, and will be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

223.    The above-described deceptive practices of Defendants present a reasonable likelihood of deception to Plaintiffs and members of the Class in that Defendants have systematically perpetrated and continue to perpetrate such acts or practices upon members of the Class by means of false, misleading, and deceptive misrepresentations and omissions on the packages of

57

Falsely Labeled Products and other advertising and marketing.

224.    Such deceptive conduct is ongoing and continues to this date.  The above-described deceptive practices of Defendants are also likely to be repeated in the future.  The above-described deceptive practices of Defendants constitute a continuing course of conduct of unfair competition and present a continuing threat to consumers in that they will continue to mislead consumers.

**WHEREFORE**, Plaintiffs, on behalf of themselves and on behalf of the other members of the Class, request award and relief as follows from each Defendant:

A.  An order **certifying** that this action is properly brought and may be maintained as a class action, that Plaintiffs be appointed Class Representatives and Plaintiffs' counsel be appointed Class Counsel;

B.  A judgment awarding Plaintiffs and the Plaintiff Class **damages** in an amount according to proof, including compensatory damages, lost expectancy, emotional distress and mental anguish, and medical monitoring;

C.  An order requiring Defendants to pay **statutory penalties** pursuant to the civil, criminal, and regulatory laws, for the benefit of the State or the Plaintiff Class, as appropriate;

D.  A judgment awarding Plaintiffs and the Plaintiff Class **restitution** in an amount according to proof;

E.  Other equitable relief, including equitable accounting, disgorgement, restitution, constructive trust, and equitable estoppel;

F.  A judgment awarding Plaintiffs and the Plaintiff Class **punitive** damages;

G.  Pre- and post-judgment interest.

H.  Attorneys' fees and expenses and the costs of this action;

I.  An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Defendants as a result of the unfair, misleading, fraudulent and unlawful conduct alleged herein;

J.  A declaratory judgment in favor of Plaintiffs and the Plaintiff Class, under California

FIRST AMENDED CLASS ACTION COMPLAINT

law, Michigan law, and 28 U.S.C. §§ 2201-2202, stating that the Unnatural Substances listed above are not "all natural," and their inclusion in a food product renders the statement that the product as "all natural" or containing "nothing artificial" is false, deceptive, and misleading.

K.  An order permanently enjoining Defendants' present and future wrongful conduct, including, but not limited to, an order:

1)  Enjoining Defendants from continuing to make the false, deceptive, and misleading statements and omissions set forth above;

2)  Enjoining Defendants from continuing to offer for sale any Falsely Labeled Products that contain any false, misleading, and/or deceptive or unsubstantiated statements and claims on its packaging and/or label, including, without limitation, those statements and claims set forth above;

3)  Enjoining Defendants from marketing, producing, or selling products that claim to be "all natural" or contain "nothing artificial" when the product contains one or more Unnatural Substances including, without limitation, those substances identified above;

4)  Ordering that Defendants immediately recall any and all units of Falsely Labeled Products;

5)  Enjoining Defendants from continuing to use the packaging and label that it presently uses for the Falsely Labeled Products;

6)  Ordering Defendants to fully disclose the truth of its misrepresentations, including the nature, identity, and method of processing or manufacture of all ingredients in its Falsely Labeled Products, including the so-called "natural flavors" and "enzymes;"

7)  Any other orders or judgments as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition; and

8)  Any other orders and judgments as may be necessary to prevent Defendants' use or employment of the deceptive practices set forth above.

L.  Such other and further relief as may be deemed necessary or appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all causes of action and/or issues so triable.

59

Dated: November 11, 2011

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BERG & ANDROPHY
David Berg


THE GOLAN LAW FIRM
Yvette Golan


FLASHPOINT LAW, INC.
Shirish Gupta


By: /s/ Yvette Golan
          Yvette Golan


Attorneys for Plaintiffs MICHAEL BATES and
VANESSA GIBSON

60