JENNER & BLOCK LLP
Kenneth K. Lee (Cal. Bar No. 264296)
klee@jenner.com
Kate T. Spelman (Cal. Bar No. 269109)
kspelman@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Phone: (213) 239-5100
Facsimile:  (213) 239-5199

JENNER & BLOCK LLP
Dean N. Panos *(pro hac vice)*
dpanos@jenner.com
Richard P. Steinken *(pro hac vice)*
rsteinken@jenner.com
353 N. Clark Street
Chicago, IL 60654
Phone: (312) 222-9350
Facsimile: (312) 527-0484

Counsel for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYE ASTIANA, MILAN BABIC, TIMOTHY BOLICK, JOE CHATHAM, JAMES COLUCCI, TAMARA DIAZ, MARTHA ESPINOLA, TAMAR LARSEN, MARY LITTLEHALE, and KIMBERLY S. SETHAVANISH, on behalf of themselves and all others similarly situated,<br><br>                  Plaintiffs,<br>          vs.<br><br>KASHI COMPANY, a California Corporation; KASHI SALES, LLC, a Delaware company; KELLOGG COMPANY, a Delaware corporation.<br><br>                  Defendants. | Case No. 11 CV 1967 H BGS<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**<br><br>Consolidated Amended Complaint Filed: February 21, 2012<br><br>Hearing Date: July 9, 2012<br>Time: 10:30 a.m.<br>Judge: The Honorable Marilyn L. Huff<br>Courtroom: 13 |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

ARGUMENT ......................................................................................................2

    I.     A Reasonable Consumer Would Not Likely Be Misled By Kashi's "Natural" Labeling. .....................................................................................................2

    II.    Plaintiffs' Claims Are Preempted Because Congress Entrusted the FDA with the Power to Regulate the Labeling of "Natural" Foods. .......................................5

    III.   The Magnuson Moss Warranty Act Claims Must be Dismissed. ............................7

    IV.   Plaintiffs Fail to Allege That Kellogg Company and Kashi Sales LLC Are Direct Participants in the Conduct at Issue To Be Named as Defendants Liable For Kashi. .........................................................................................................8

CONCLUSION....................................................................................................10

# TABLE OF AUTHORITIES

CASES                                                                                      PAGE(S)

*In re Air Bag Prods. Liab. Litig.*,
   7 F. Supp. 2d 792 (E.D. La. 1998) ........................................................................4

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S. Ct. 1937 (2009) ...............................................................3, 4

*Buetow v. A.L.S. Enterprises*,
   650 F.3d 1178 (8th Cir. 2011) ............................................................................4

*Doe v. Unocal Corp.*,
   248 F.3d 915 (9th Cir. 2001) ..........................................................................9, 10

*Eclectic Properties East, LLC v. The Marcus & Millichap Co.*,
   No. 9-511, 2012 WL 713289 (N.D. Cal. Mar. 5, 2012) ....................................9, 10

*Hairston v. South Beach Beverage Co., Inc.*,
   No. 12-1429, 2012 U.S. Dist. LEXIS 74279 (C.D. Cal. May 18, 2012) ........................ *passim*

*Hillside Drilling Inc. v. Goldman Sachs Group*,
   No. 09-1896, 2009 U.S. Dist. LEXIS 64595 (N.D. Cal. July 27, 2009).........................8, 9, 10

*KEMA Inc. v. Koperwhats*,
   2010 U.S. Dist. LEXIS 90790 (N.D. Cal. Sept. 1, 2010) .......................................10

*Lavie v. Procter & Gamble Co.*,
   105 Cal. App. 4th 496 (2003) ............................................................................2

*Rooney v. Cumberland Packing Corp.*,
   2012 U.S. Dist. LEXIS 58710 (S.D. Cal. Apr. 16, 2012)...................................1, 2, 3

*People v. Bestline Products, Inc.*,
   61 Cal. App. 3d 879 (1976) ...............................................................................9

*Pom Wonderful LLC v. The Coca-Cola Company*,
   No. 10-55861, 2012 U.S. App. LEXIS 9921 (9th Cir. May 17, 2012)............................2, 5, 6

*In re Sears, Roebuck & Co.*,
   No. MDL-1703, 2006 WL 1443737 (N.D. Ill. May 17, 2006)...................................8

OTHER AUTHORITIES

58 Fed. Reg. 2302 (Jan. 6, 1993) .........................................................................4

21 C.F.R. § 163.110(b)(1)...................................................................................6

21 C.F.R. § 137.180(a).......................................................................................6

21 C.F.R. § 169.175(a)(1) 21 ........................................................................................6

21 C.F.R. § 184.1400 ....................................................................................................6

21 C.F.R. § 101.9(k)(4) ................................................................................................7

Reply in Support of Motion to Dismiss Consolidated Amended Complaint
Case No. 3:11-cv-1967-H-BGS

## **INTRODUCTION**

Plaintiffs' lawsuit against Kashi's "natural" labeling amounts to nothing more than a game of superficial semantics.  The complaint bandies about various scientific terms for vitamins, naturally derived ingredients, and commonly accepted processing aids — and then insinuates that Kashi's packaged food products cannot be "natural" because they contain ingredients that have hard-to-pronounce, scientific names (*e.g.*, calcium pantothenate).  But Plaintiffs in their opposition brief still cannot articulate why any of the challenged ingredients or processing aids would be unexpected in a *packaged* food product.  Indeed, the FDA has declared that even artificial and/or synthetic ingredients are permissible in "natural" foods *as long as they are not unexpected* in the food product. Plaintiffs' absolutist and implausible definition of "natural" defies any reasonable consumer expectation of "natural" packaged food products.  As set forth in Kashi's motion to dismiss, this lawsuit must be dismissed for several reasons:

First, a reasonable consumer would not likely be misled by the "natural" labels found on Kashi's packaged cereals, snacks, and frozen entrée products.  Consistent with the FDA's policy for the use of the term "natural," a reasonable consumer would expect that a *packaged* product would be fortified with vitamins and other ingredients that have undergone certain processing to prolong the product's shelf-life.  It is not enough for Plaintiffs to sprinkle scientific-sounding ingredients throughout the complaint and merely claim that they should not be included in a "natural" product. In fact, federal regulations for certified organic products — which face a more rigorous and higher standard than for "natural" products — expressly allow the inclusion of most of the ingredients that are the subject of this lawsuit.  As this Court recently recognized in *Rooney v. Cumberland Packing Corp.*, No. 12-CV-0033, 2012 U.S. Dist. LEXIS 58710 (S.D. Cal. Apr. 16, 2012), mislabeling claims must be dismissed as a matter of law when plaintiffs provide little support for their allegations that reasonable consumers would be misled under "common industry" standards.  Here, Plaintiffs' bare-bones allegations meet neither *Iqbal*'s "plausibility" pleading standard nor California consumer protection law's requirement that a challenged statement be "likely to deceive" a reasonable consumer.

Second, Plaintiffs' state law claims are preempted under federal law.  Although Plaintiffs attempt to avoid preemption by arguing that the FDA's natural policy is non-binding, the Ninth Circuit's recent decision in *Pom Wonderful LLC v. The Coca-Cola Company*, No. 10-55861, 2012 U.S. App. LEXIS 9921 (9th Cir. May 17, 2012) undermines Plaintiffs' position.  There, the Ninth Circuit showed significant deference to the FDA's power to regulate food labeling.  The court held that the plaintiff's Lanham Act claim regarding juice labeling was preempted based on the FDA's power to proscribe such labeling, even though the FDA had not yet done so.  This Court should similarly defer to the FDA's power to regulate "natural" foods, and dismiss Plaintiffs' state law claims as preempted.  Further, Plaintiffs' claims based on the scientific names for common vitamins must be preempted because federal regulations expressly allow the use of such terms on the labels of food products.

Third, Plaintiffs cannot save their Magnuson Moss warranty claims.  Although Plaintiffs try to shoehorn their claims within the statutory definitions of written and implied warranties, it is clear that their allegations do not fall within the limited reach of the Magnuson Moss Warranty Act.

Lastly, Plaintiffs do not allege facts sufficient to hold Kellogg and Kashi Sales liable as direct participants in Kashi's challenged conduct.  Because Plaintiffs' allegations are patently insufficient to pierce the corporate veil, Kellogg and Kashi Sales must be dismissed as defendants in this case.

## ARGUMENT

## I.  A Reasonable Consumer Would Not Likely Be Misled By Kashi's "Natural" Labeling.

Under California's consumer protection statutes, "conduct is deceptive or misleading if it is likely to deceive an ordinary, reasonable consumer."  *Rooney*, 2012 U.S. Dist. LEXIS 58710, at *8-9.  "'Likely to deceive' implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner.  Rather, the phrase indicates that the ad is such that it is probable that *a significant portion of the general consuming public or of target consumers, acting reasonably in the circumstances, could be misled.*'"  *Id.* (quoting *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003)) (emphasis added).  Dismissal is proper if the challenged conduct is not likely to deceive as a matter of law.

An instructive case is this Court's recent decision in *Rooney v. Cumberland Packing Corp.* There, the plaintiff targeted Sugar in the Raw®, a brand of turbinado sugar, on the grounds that "the use of the phrase 'in the raw' misled her and similarly situated into believing the product was raw, unprocessed, and unrefined."  2012 U.S. Dist. LEXIS 58710, at *10.  This Court granted the defendants' motion to dismiss without leave to amend because "a reasonable consumer could not be led to believe that Sugar in the Raw® contains unprocessed and unrefined sugar."  *Id* at *11. Specifically, the court noted that turbinado sugar is known "in the industry as raw cane sugar." *Id* at *12.  Accordingly, the Court found that a reasonable consumer would understand Sugar in the Raw® turbinado sugar to be "raw cane sugar" as defined by the industry, and would not expect it to be unprocessed and unrefined sugar.  *See id* at *12-13.

Similarly here, "a significant portion of the general consuming public or of target consumers, acting reasonably in the circumstances" would not likely be deceived into believing that Kashi's *packaged* products contain only fresh fruits or plants plucked from the ground or a tree, or that the products have undergone *no* degree of processing to aid in shelf stability.  *See id* at *8-9.  Rather, the reasonable consumer understands that a packaged natural food product contains ingredients extracted from natural sources, fortificants, processing aids, and leavening agents, as are found in Kashi products.  Notably, Plaintiffs do not dispute that Kashi follows Whole Foods' well-known list of unacceptable ingredients, which is the gold standard among natural and organic food consumers. The fact that all of Kashi's ingredients are accepted by the natural foods industry is strong evidence that reasonable consumers would not be deceived by Kashi's natural label. *Id* at *12 (noting that turbinado sugar "is widely marketed in the industry as raw cane sugar").

Plaintiffs have the burden of articulating a plausible theory as to why the supposedly synthetic ingredients would not be expected in Kashi's packaged cereals, snacks, and frozen entrées in.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009); *see also* 58 Fed. Reg. 2302 2302, 2407 (Jan. 6, 1993) (FDA declaring that a food can be labeled as "natural" when "nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food *that would not normally be expected to be in the food.*") (emphasis added).  But they fail to do so in

their amended complaint or their opposition brief.  Indeed, their 25-page opposition brief devotes only *two* pages to rebutting this point, most of which amount to only "labels and conclusion" and "formulaic recitation of the elements of a cause of action" that are insufficient to survive dismissal. *Iqbal*, 129 S. Ct. at 1949.

Perhaps recognizing that a reasonable consumer expects a "natural" packaged product to include fortificants and processing aids, Plaintiffs argue that Kashi has used the phrase "all natural," as if the word "all" combined with "natural" somehow transforms consumers' expectations about the ingredients contained in Kashi products.  Compl. ¶ 61; Opp. at 14-15.  But that argument merely begs the question of whether all of those ingredients, individually, are natural.  Plaintiffs must allege why each challenged ingredient "would not normally be expected in the food."  They have failed to present any plausible theory in this regard.  And even if one or two ingredients were deemed to be non-natural, Plaintiffs' argument still lacks force because a reasonable consumer would not expect that every single ingredient in a packaged product would be "natural" without any processing whatsoever.  *Cf. Buetow v. A.L.S. Enterprises*, 650 F.3d 1178, 1186 (8th Cir. 2011) (overruling district court's determination that a statement that promised the complete elimination of all odor was misleading because no one would be "so scientifically unsophisticated as to believe that any product can 'eliminate' every molecule of human odor"); *In re Air Bag Prods. Liab. Litig.*, 7 F. Supp. 2d 792, 801 (E.D. La. 1998) (reasonable consumer would not deduce from advertisements that Chrysler passengers "are literally surrounded with safety" "that passengers were completely insulated from the risk of air bag deployment").

Plaintiffs also skirt around the fact that most of the challenged ingredients are specifically sanctioned by the United State government as acceptable ingredients for organic foods.  Instead of addressing this point head-on, Plaintiffs argue in a footnote that "'Organic' and 'All Natural' are completely separate terms, with distinct meanings, and the definition of the former simply does not dictate the meaning of the latter."  Opp. at 15 n.14.  This argument ignores the significance of the organic regulations.  Kashi does not dispute that the terms "organic" and "natural" have different definitions.  Rather, the salient point is that the organic regulations are significantly stricter than the

4

FDA's "natural" policy, and Plaintiffs do not — because they cannot — explain why ingredients sanctioned for use in the more strictly regulated "organic" foods would be unexpected in "natural" food products.   A reasonable consumer understands that ingredients found acceptable under the strict organic regulations would, *a fortiori*, be acceptable in natural foods.  Plaintiffs also do not appear to dispute that many of the challenged ingredients are either vitamins or are derived from natural substances, and do not constitute "artificial" or "synthetic" products.[1]

## II.    Plaintiffs' Claims Are Preempted Because Congress Entrusted the FDA with the Power to Regulate the Labeling of "Natural" Foods.

As explained in Kashi's opening brief, Plaintiffs' claims are preempted because they attempt to compel this Court to legislate a state law standard of "natural" that is different from the federal policy on "natural" foods.  In an effort to evade preemption, Plaintiffs claim that "the FDA's 'natural policy' is not entitled to preemptive effect" because it is an informal policy not mandated by the FDA.  Opp. at 10-12.  But Plaintiffs' argument is inconsistent with the broad expression of federal preemption recently articulated by the Ninth Circuit in *Pom Wonderful LLC v. The Coca-Cola Company*, 2012 U.S. App. LEXIS 9921.  In *Pom Wonderful*, the Ninth Circuit held that the Food, Drug and Cosmetic Act (FDCA) preempted the plaintiff's Lanham Act claims related to allegedly misleading label on Coca-Cola's Pomegranate Blueberry juice because Congress delegated this area to the FDA, even though the FDA may not have issued specific regulations governing the specific issue.  *See id*. at *2-3.  Noting that the FDCA "comprehensively regulates food and beverage labeling" (*id*. at *7), the Ninth Circuit held:

> If the FDA believes that this context misleads consumers, it can act.  But the FDA has
> apparently not taken a view on whether Coca-Cola's labeling misleads consumers –
> even though it has acted extensively and carefully in this field.  (The FDA has not
> established a general mechanism to review juice beverage labels before they reach
> consumers, but the agency may act if it believes that a label in the market is
> deceptive.) . . .  We are primarily guided in our decision not by Coca-Cola's apparent

---

[1] In *Hairston v. South Beach Beverage Co., Inc.*, No. 12-1429, 2012 U.S. Dist. LEXIS 74279 (C.D. Cal. May 18, 2012), the court noted that ascorbic acid, calcium pantothenate, and pyridoxine hydrochloride, which are challenged by Plaintiffs here, "are accepted form of Vitamins C, . . . B5, . . . and B6."  *Id*. at *3-4 n.2.  Further, the court suggested that it would reject the plaintiff's challenge to xantham gum because xantham gum is "derived from natural bacterium."  *Id*.

1
2

> compliance with FDA regulations but by Congress's decision to entrust matters of juice beverage labeling to the FDA and by the FDA's comprehensive regulation of that labeling.

3  *Id* at *15-16.  The same rationale applies here.  Even though the FDA has "not taken a view on

4  whether [Kashi's] labeling misleads consumers" and "has not established a general mechanism to

5  review [natural labels] before they reach consumers," the agency may act — and indeed has done so

6  — if it believes that a "natural" label is deceptive.[2]  Further, the FDA has implemented a

7  comprehensive regulatory scheme regarding food labeling, including many regulations that apply to

8  the specific ingredients challenged here.[3]  Plaintiffs' complaint must be dismissed in deference to

9  "Congress's decision to entrust matters of [food] labeling to the FDA and by the FDA's

10  comprehensive regulation of that labeling."  2012 U.S. App. LEXIS 9921, at *16.

11    Moreover, to the extent Plaintiffs challenge Kashi's use of common vitamin names in its

12  ingredient lists (*i.e.*, ascorbic acid (Vitamin C), calcium pantothenate (Vitamin B5), pyridoxine

13  hydrochloride (Vitamin B6), and tocopherols (Vitamin E)), the Central District of California recently

14  held in an analogous "all natural" case that "claims related to Defendants' use of the common names

15  of vitamins are preempted."  *Hairston*, 2012 U.S. Dist. LEXIS 74279, at * 9.  In *Hairston*, the

16  plaintiff challenged as potentially misleading the "all natural" label on Lifewater beverages because

17  the drinks contained added vitamins listed by their common names (including both ascorbic acid and

18  calcium pantothenate).  *Id* at *3-4.  The court dismissed this claim without leave to amend,

19  recognizing that the FDA regulates the labeling of vitamins.  *Id* at *9.  In fact, under FDA

20  regulations, a food is considered "misbranded" if it "represents, suggests, or implies . . . that a natural

21
22

---

23  [2] Plaintiffs acknowledge that the FDA recently sent a warning letter regarding another company's
24  "natural" label.  Opp. at 13. The FDA regularly considers and acts upon "natural" and "all natural" labeling when it determines that the labeling does not comply with the FDA natural policy.  *See, e.g.*,
25  Exs. A-C.

26  [3] *See, e.g.*, 21 C.F.R. § 163.110(b)(1) (permitting the use of potassium bicarbonate in cacao nibs); 21 C.F.R. § 137.180(a) (regulating use of and labeling of sodium acid pyrophosphate in self-rising flour); 21 C.F.R. § 169.175(a)(1) (permitting use of glycerin in vanilla extract, to be labeled
27  according to parts 101 and 130 of Chapter 21); 21 C.F.R. § 184.1400 (identifying lecithin as "naturally occurring," to be used in food "with no limitation other than current good manufacturing
28  practice").

vitamin in a food is superior to an added or synthetic vitamin." 21 C.F.R. § 101.9(k)(4). The *Hairston* court concluded that the plaintiff "cannot avoid preemption of these claims by arguing that his claim relates solely to Defendants' 'all natural' representations . . . . Plaintiff's argument would effectively allow Plaintiff to avoid preemption of those claims, and would undermine the purpose of the federal labeling standards which includes avoiding a patchwork of different state standards." *Id* at *9-10.

Likewise here, Plaintiffs cannot pursue claims related to the fortificants added to Kashi's packaged natural foods because the labeling of vitamins is expressly allowed under federal law. Allowing Plaintiffs to proceed with their state law claims of deception would "undermine the purpose of the federal labeling standards." *Id*

### III.    The Magnuson Moss Warranty Act Claims Must be Dismissed.

While acknowledging that the Magnuson Moss Warranty Act extends only to "written warranties" as statutorily defined, Plaintiffs argue that their written warranty claim falls under the so-called "defect free" prong of the statutory definition. Pointing to their allegation that "Defendants provide a 'written warranty' within the meaning of [Magnuson Moss]" by "prominently affirming and promising in writing on the labeling of the [Kashi] Products that the [Kashi] products were 'All Natural' or 'Nothing Artificial,'" (Compl. ¶ 100), Plaintiffs argue that such product descriptions constitute written warranties for a defect-free product. Courts, however, have rejected Plaintiffs' attempts to conflate descriptive labels with warranties that a product will be "defect free."

For example, in *Hairston*, 2012 U.S. Dist. LEXIS 74279, the court dismissed a strikingly similar Magnuson Moss written warranty claim without leave to amend. There, the court held as follows:

> The Lifewater label fails to meet the definition of 'written warranty' under Section 2301(6)(A) of the MMWA because the label neither promises a defect-free product, nor guarantees a level of performance over a specific time period. The challenged statements – 'all natural with vitamins' and the names of various Lifewater flavors – are 'product descriptions' rather than promises that Lifewater is defect-free, or guarantees of specific performance levels.

7

*Id* at *18.  And in *In re Sears, Roebuck & Co.*, No. MDL-1703, 2006 WL 1443737 (N.D. Ill. May 17, 2006), the court rejected an analogous claim that the labeling of certain tools as "Made in USA" constituted a written warranty within the meaning of the MMWA.  *Id* at *4.  As the court explained, "[t]he phrase is a product description that does not inform consumers that the tools are defect-free or make any representation about performance at a specified level over a specified time. . . . Although the phrase does arguably relate to the 'nature' of the material or workmanship, it fails to satisfy the defect-free/performance prong of § 2301(6)(A)."  *Id*  Kashi's labels are precisely the type of product descriptions that fall outside the limited scope of the Act.  Plaintiffs' breach of written warranty claim under Magnuson Moss must therefore be dismissed.

Further, as the *Hairston* court recognized, Magnuson Moss is "inapplicable to any written warranty the making or content of which is otherwise governed by Federal law."  2012 U.S. Dist. LEXIS 74279, at *17 (quoting 15 U.S.C. § 2311(d)).  Here, as in *Hairston*, "the FDCA and FDA labeling regulations govern the [] labeling challenged by Plaintiff," and thus, "Plaintiff cannot state a claim under the MMWA."  *Id*

Plaintiffs' implied merchantability claim must also be dismissed.  They allege that they have sufficiently pled an implied warranty claim by claiming that Kashi's products do not "[c]onform to the promises or affirmations of fact made on the container or label."  Other than one case which Kashi addressed in its opening brief, Plaintiffs cite to no authority supporting an implied warranty claim for a food product's alleged failure to conform to descriptions on the product label.  Plaintiffs should not be permitted to transform the federal Magnuson Moss statute into a catch-all food mislabeling law.  In any event, the implied warranty claim must be dismissed because Kashi's packaged natural foods, as set forth above, conform to the expectations of reasonable consumers.

## IV. Plaintiffs Fail to Allege That Kellogg Company and Kashi Sales LLC Are Direct Participants in the Conduct at Issue To Be Named as Defendants Liable For Kashi.

Plaintiffs cannot dispute that "courts generally treat the alter ego doctrine as a drastic remedy and disregard the corporate form only reluctantly and cautiously."  *Hillside Drilling Inc. v. Goldman Sachs Group*, No. 09-1896, 2009 U.S. Dist. LEXIS 64595, at *12 (N.D. Cal. July 27, 2009).  To

make out a prima facie case of alter ego liability, a plaintiff must show that "'there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist," and that "failure to disregard [their separate entities] would result in fraud or injustice." *Id* (citing *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001)).  Faced with this deeply ingrained principle of corporate law, Plaintiffs attempt to sidestep it by arguing that Kellogg and Kashi Sales may be held liable as "direct participants in the conduct at issue."  Opp. at 19.

This argument must be rejected because it distorts the allegations in the Complaint, which do not allege sufficient direct participation.  Citing *People v. Bestline Products, Inc.*, 61 Cal. App. 3d 879 (1976), and *Eclectic Properties East, LLC v. The Marcus & Millichap Co.*, No. 9-511, 2012 WL 713289 (N.D. Cal. Mar. 5, 2012), Plaintiffs argue that parent corporations may in some circumstances be held liable as direct participants in challenged activity.  Opp. at 19.  Kashi does not dispute this general legal proposition; however, it is inapplicable here, and Plaintiffs' legal authorities are inapposite.  In *Bestline Products*, the parent corporation admitted in its answer that the parent and subsidiary were jointly "engaged in the manufacture and sale of soap products," and that "*their* marketing program consists of different levels of distributors."  61 Cal. App. 3d at 921 (emphasis added).  The court recognized that these blatant admissions evidenced the "direct participation" of the parent corporation in the challenged activity.  *Id* at 920.  There are no such admissions here.  *Eclectic Properties East* is even further afield.  There, the court held merely that it need not engage in an alter ego analysis to determine the liability of the *subsidiary* corporation that was alleged to have provided sale-leaseback financing to fund a RICO scheme.  2012 WL 713289, at *6  In any event, the court in *Eclectic Properties East* held that it could *not* pierce the corporate veil under an alter ego theory as to the parent corporation, despite the plaintiffs' "conten[tions] that they have alleged [the parent's] 'direct involvement' in the alleged RICO scheme."  *Id* at *4-6.

Here, Plaintiffs cannot circumvent the Defendants' corporate form by arguing conclusorily that Kellogg and Kashi Sales are directly liable for Kashi's actions.  The allegations in the Complaint clearly evidence Plaintiffs' intent to hold Kellogg and Kashi Sales liable for Kashi's actions based

9

solely on their relationship with Kashi.  *See* Compl. ¶¶ 23-24.  But those allegations are insufficient to meet the high bar required to pierce the corporate veil.

With respect to Kellogg, Plaintiffs allege that Kellogg "wholly-owns Kashi," provides financing to Kashi, shares space with Kashi, "takes credit" for Kashi's success by referencing Kashi as one of "our top brands," and that the *former* General Manager of Kashi now serves as the President of Kellogg Asia Pacific.  *See* Opp. at 21-22; Compl. ¶ 23.[4]  With respect to Kashi Sales, Plaintiffs allege that Kashi Sales distributes Kashi products, and shares office space with Kashi. Opp. at 22.  Even if true, these allegations are insufficient to establish that either defendant is the instrumentality of Kashi.  In *Eclectic Properties East*, for example, the court granted a motion to dismiss the parent corporation because "Plaintiffs do not allege any facts showing that an inequitable result would follow from respecting corporate separateness."  2012 WL 713289, at *6.  The court noted that "[p]laintiffs' allegations regarding common principals do not plausibly demonstrate alter ego liability, . . . [n]or does 100% control through stock ownership or the fact that companies share the same offices necessarily make companies alter egos."  *Id* at *5-6.  Plaintiffs' allegations do not go beyond the allegations found lacking in *Eclectic*.  Similarly, under the Ninth Circuit's decision in *Doe v. Unocal* 248 F.3d 915 (9th Cir. 2001),[5] discussed at length in Kashi's opening brief, it is clear that the factual allegations in Plaintiffs' Complaint are patently insufficient to justify piercing the corporate veil.

## CONCLUSION

For the foregoing reasons, in addition to those set forth in Defendants' opening brief, the Court should dismiss Plaintiffs' Complaint in its entirety with prejudice.

---

[4] Plaintiffs allege in the Complaint that Kellogg "signed off on Kashi's 'real food' campaign." ¶ 23. Yet the article cited by Plaintiffs in support of this contention also states that "Kashi operates quite independently of Kellogg." Compl. Ex. 5 at 1.

[5] Plaintiffs claim that *Doe v. Unocal* is inapposite because the court applied an alter ego analysis in the context of exercising jurisdiction. This distinction is meaningless, as evidenced by the fact that many courts have relied on *Unocal* to define the general standard for piercing the corporate veil. *See, e.g.*, *KEMA Inc. v. Koperwhats*, 2010 U.S. Dist. LEXIS 90790, at *16 (N.D. Cal. Sept. 1, 2010); *Hillside Drilling Inc*, 2009 U.S. Dist. LEXIS 64595, at *12.  Tellingly, Plaintiffs do not articulate how the *Unocal* standard is different from the standard applied outside the jurisdictional context.

10

1 | Dated:  June 20, 2012

JENNER & BLOCK LLP

/s Kenneth K. Lee
By: Kenneth K. Lee

Attorneys for Defendant Kashi, Inc.

# EXHIBIT A



U.S. Department of Health & Human Services

U.S. Food & Drug Administration

# Inspections, Compliance, Enforcement, and Criminal Investigations

Home ▸ Inspections, Compliance, Enforcement, and Criminal Investigations ▸ Enforcement Actions ▸ Warning Letters

## Alexia Foods, Inc 11/16/11



Department of Health and Human Services

Public Health Service
Food and Drug Administration
College Park, Maryland

**WARNING LETTER**
**NOV 16, 2011**

**OVERNIGHT MAIL**
**RETURN RECEIPT REQUESTED**

Alex Dzieduszycki, CEO/President
Alexia Foods, Inc.
51-02 21st Street, #3B
Long Island City, New York 11101

Dear Mr. Dzieduszycki:

The U.S. Food and Drug Administration (FDA) has reviewed the labels for your Alexia brand Roasted Red Potatoes & Baby Portabella Mushrooms products. Based on our review, we have concluded that these products are in violation of the Federal Food, Drug, and Cosmetic Act (the Act). You can find copies of the Act and the FDA regulations through links in FDA's home page at http://www.fda.gov [1].

Your Alexia brand Roasted Red Potatoes & Baby Portabella Mushrooms product is misbranded within the meaning of section 403(a)(1) of the Act [21 U.S.C. 343(a)(1)], which states that a food shall be deemed to be misbranded if its labeling is false or misleading in any particular. The phrase "All Natural" appears at the top of the principal display panel on the label. FDA considers use of the term "natural" on a food label to be truthful and non-misleading when "nothing artificial or synthetic...has been included in, or has been added to, a food that would not normally be expected to be in the food." [58 FR 2302, 2407, January 6, 1993].

Your Alexia brand Roasted Red Potatoes & Baby Portabella Mushrooms product contains disodium dihydrogen pyrophosphate, which is a synthetic chemical preservative. Because your products contain this synthetic ingredient, the use of the claim "All Natural" on this product label is false and misleading, and therefore your product is misbranded under section 403(a)(1) of the Act.

We note that your Alexia brand products market a number of food products with the "All Natural" statement on the label. We recommend that you review all of your product labels to be consistent with our policy to avoid additional misbranding of your food products.

This letter is not intended to be an all-inclusive review of your products and their labeling. It is your responsibility to ensure that all of your products and labeling comply with the Act and its implementing regulations. You should take prompt action to correct the violations cited in this letter. Failure to do so may result in enforcement action without further notice. Such action may include, but is not limited to, seizure or injunction.

Please respond in writing within fifteen (15) working days from your receipt of this letter. Your response should outline the specific actions you are taking to correct these violations and to prevent similar violations. You should include in your response documentation, such as revised labels or other useful information, that would assist us in evaluating your corrections. If you cannot complete all corrections before you respond, we expect that you will explain the reason for the delay and state when you will correct any remaining violations.

Your written response should be sent to Latasha Robinson, Food and Drug Administration, Center for Food Safety and Applied Nutrition, 5100 Paint Branch Parkway, Office of Compliance (HFS-608), Division of Enforcement, College Park, Maryland 20740-3835. If you have any questions, please contact Ms. Robinson at 301-436-1890.

Sincerely yours,
/S/
Michael W. Roosevelt
Acting Director
Office of Compliance

Center for Food Safety
 and Applied Nutrition

cc:  New York District Office

---

**Links on this page:**

1.  http://www.fda.gov/

- Accessibility
- Contact FDA
- Careers
- FDA Basics
- FOIA
- No Fear Act
- Site Map
- Transparency
- Website Policies

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Email FDA

- 
-
-
-
-
-
- For Government
- For Press

- Combination Products
- Advisory Committees
- Science & Research
- Regulatory Information
- Safety
- Emergency Preparedness
- International Programs
- News & Events
- Training and Continuing Education
- Inspections/Compliance
- State & Local Officials
- Consumers
- Industry
- Health Professionals

U.S Department of Health & Human Services

---

**Links on this page:**

1.  http://www.fda.gov/

# EXHIBIT B

 U.S. Department of Health & Human Services

U.S. Food & Drug Administration

## Inspections, Compliance, Enforcement, and Criminal Investigations

Home Inspections, Compliance, Enforcement, and Criminal Investigations Enforcement Actions Warning Letters

### Shemshad Food Products, Inc 3/11/11



**Department of Health and Human Services**

Public Health Service
Food and Drug Administration
Los Angeles District
Pacific Region
19701 Fairchild
Irvine, CA 92612-2506
Telephone: 949-608-2900
FAX: 949-608-4415

**WARNING LETTER**

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

March 11th, 2011

W/L 28-11

Mr. Cyrus Teadolmanesh, President
Shemshad Food Products, Inc.
3047 Rosslyn St.
Los Angeles, CA, 90065

Dear Mr. Teadolmanesh:

The U.S. Food and Drug Administration (FDA) inspected your manufacturing facility, Shemshad Food Products, Inc, located at 3047 Rosslyn St, Los Angeles, CA, 90065, on September 23-30, 2010. You are manufacturing acidified foods, juices, and other food products. The inspection revealed serious violations of the Acidified Food regulations [21 Code of Federal Regulations (CFR) Parts 108 and 114], the Current Good Manufacturing Practice regulation for food [21 CFR, Part 110], the labeling provisions of Section 403 of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 343], and the provisions of Section 505 of the Act that address the marketing of new drugs [21 U.S.C. § 355].

Based on your failure to comply with 21 CFR Part 114 we have determined that your acidified products including vegetable stew, walnut stew, split pea stew, pickled turnip, pickled garlic, pickled eggplant, pickled asparagus and chopped mixed vegetables packed in glass jars are adulterated within the meaning of Section 402(a)(4) of the Act [21 U.S.C. § 342 (a)(4)] in that they have been prepared, packed, or held under insanitary conditions whereby they may have become contaminated with filth, or whereby they may have been rendered injurious to heath.

As an acidified food processor, you are required to comply with the Act and the federal regulations relating to the processing of acidified foods. These regulations are described in 21 CFR Part 108, Emergency Permit Control, and in 21 CFR Part 114, Acidified Foods. The Emergency Permit Control regulation was issued, in part, pursuant to Section 404 of the Act [21 U.S.C. § 344]. A temporary emergency permit may be required for acidified foods whenever a processor fails to fulfill the mandatory requirements of 21 CFR Part 108, Subpart B, including registration and filing of process information, and the mandatory requirements within 21 CFR Part 114.

Additionally, based on your failure to comply with the requirements of the Current Good Manufacturing Practice (CGMP) regulation in 21 CFR Part 110 we have determined that your food products are adulterated within the meaning of Section 402(a)(4) of the Act, [21 USC § 342(a)(4)] in that they have been prepared, packed, or held under insanitary conditions whereby they may have become contaminated with filth, or whereby they may have been rendered injurious to heath.

Also, as further discussed below, your firm produces a variety of products that are misbranded within the meaning of Section 403 of the Act. Moreover, one of your product is a "new drug" under section 201(p) of the Act [21 U.S.C. § 321(p)]. New drugs may not be legally marketed in the U.S. without prior approval from FDA as described in Section 505(a) of the Act [21 U.S.C. § 355(a)].

You may find the Act, the Acidified Food regulations, and the CGMP regulations for food through links in FDA's home page at www.fda.gov [1]. The significant violations documented during the inspection include the following:

**Acidified Foods**

1. You must provide the FDA, before packing any new product, information on the scheduled processes for each acidified food in each container size, to comply with 21 CFR 108.25(c)(2). Your firm manufactures acidified foods including but not limited to vegetable stew, walnut stew, split pea stew, hot pepper sauce, fine mixed vegetables, coarse mixed vegetables, pickled garlic and pickled turnip. You have not filed any scheduled processes with the FDA for the acidified foods you manufacture.

2. You must maintain processing and production records showing adherence to the scheduled processes, including records of pH measurements and other critical factors intended to ensure a safe product, to comply with 21 CFR 114.100(b). However, you did not maintain any records of pH measurements or other critical factors for your acidified foods manufactured between November 2008 and August 2010.

3. Each container of acidified foods must be marked with an identifying code specifying, among other things, the year, day, and period during which it was packed, as required by 21 CFR 114.80(b). However, on September 23, 2010, numerous acidified foods including pickled mixed vegetables, walnut stew, vegetable stew, and hot pepper sauce were found stored in your warehouse for distribution that were not marked with an identifying code.

4. You must maintain records identifying initial distribution of the finished product, to comply with 21 CFR 114.100(d). However, our inspection found you do not maintain records identifying initial distribution of finished products.

5. You must prepare and maintain files on a current procedure that includes plans for distributors to follow for recalling products, to comply with 21 CFR 108.25(e). However, our inspection found you do not maintain such a procedure.

6. You must maintain records of examinations of raw materials, packaging materials, and finished products, and of supplier's guarantees or certifications that verify compliance with FDA regulations, to comply with 21 CFR 114.100(a). However, our inspection found you do not maintain such records.

7. Instruments used for measuring pH must be accurate, to comply with 21 CFR 110.40(f). Under 21 CFR 114.90(a)(3)(iii), the accuracy of most pH meters is stated to be approximately 0.1 pH unit, and reproducibility is usually +/-0.05 pH unit or less. However, our inspection found your pH meter was not accurate, because it read 3.68 when tested in a 4.0 buffer. Controlling the pH of acidified foods is essential for product safety and your pH meter must be accurate to enable you to monitor the process.

## Current Good Manufacturing Processes

1. All persons working in direct contact with food, food-contact surfaces, and food-packaging materials must wash their hands thoroughly (and sanitize if necessary to protect against contamination with undesirable microorganisms) in an adequate hand-washing facility after each absence from the work station and at any other time their hands may have become soiled or contaminated, to comply with 21 CFR 110.10 (b)(3). However, throughout the inspection, employees were observed moving between different rooms, emptying trash, touching the floor, and/or handling other unsanitary objects and then putting on a pair of gloves and starting to work in production without washing or sanitizing their hands. On at least eight occasions, employees were observed leaving their workstation with gloved hands and returning to work in production while wearing the same pair of gloves. On September 27, 2010, an employee was observed leaving his food production workstation, retrieving boxes from the warehouse and then returning to processing ready-to-eat dried fruit snacks without first washing and sanitizing his hands.

2. Hand-washing facilities must be furnished with running water at a suitable temperature, as required by 21 CFR 110.37(e).  Our inspection found the hand-washing sink in the processing room lacked hot water.

3. Effective measures must be taken to exclude pests from the processing areas and protect against the contamination of food on the premises by pests, as required by 21 CFR 110.35(c). However, a 55 gallon drum of cooked in-process apples in the processing room contained insect larva and flying insects. Live and dead cockroach-like insects were observed on food processing tables, walls, and on in-process food containers within the processing room, hallways, and office areas. Flying insects were observed in processing rooms and ingredient storage areas.

4. You must identify, hold, and store toxic cleaning compounds and sanitizing agents in a manner that protects against contamination of food, food-contact surfaces, or food-packaging materials, to comply with 21 CFR 110.35(b)(2). However, cleaning and sanitizing agents were observed stored among raw ingredients, food utensils, and packaging materials. In addition, at least two of these cleaning and sanitizing agents were stored in unmarked containers.

5. You must locate and operate fans and other air-blowing equipment in a manner that minimizes the potential for contaminating food, food-packaging materials, and food-contact surfaces, to comply with 110.20(b)(6). However, on September 23, 2010, a dust-covered exhaust fan was observed circulating air inside of the front drying room where racks of uncovered ready-to-eat dried fruit snacks were held to dry. On September 27, 2010, the air vent in the cooking room, which was covered with dust, debris and peeling paint, was observed blowing air directly on uncovered in-process Sour Cherry Juice.

6. Equipment and containers used to convey, hold, or store work-in-process must be constructed, handled, and maintained during manufacturing or storage in a manner that protects against contamination, to comply with 21 CFR 110.80(b)(7). However, our inspection found that you are storing 55 gallon drums of in-process foods including acidified foods and fermenting fruit outside in the parking lot area. Drums with poorly sealed lids, and lids that were ajar were stored immediately adjacent to an open bulk trash bin.  In addition, a gas can, a bed frame, unused equipment, tools, hoses, rags, and litter were observed stored on top of and amongst these in-process food drums.

7. Effective measures must be taken to protect finished food from contamination by raw materials, other ingredients, or refuse, to comply with 21 CFR 110.80(b)(6). However, our inspection found that you are holding and storing raw ingredients, in-process foods, finished product, and food scheduled for rework in unmarked containers.  For example, an unmarked container of potassium sorbate preservative was found stored along with other raw ingredients. You must identify and store your raw materials so they are not mistaken or misused whereby they may become contaminants.

## Misbranding

1. Your Lime Juice Natural product is misbranded within the meaning of Section 403(a)(1) of the Act [21 U.S.C. § 343(a)(1)] in that the label uses the term "natural" in a manner that is false and misleading. FDA considers use of the term "natural" on a food label to be truthful and non-misleading only when nothing artificial or synthetic has been included in, or has been added to, a food that would not normally be expected to be in the food [58 FR 2302, 2407 (January 6, 1993); 21 CFR 101.22]. The ingredient statement for this product declares the synthetic chemical preservative "sodium benzoat 1%" [sic]. Accordingly, the use of the term "natural" in association with this product is false and misleading.

2. Your Ghara-Ghoroot Lavashak dry brown curd snack product is misbranded within the meaning of section 403(w) of the Act [21 U.S.C. § 343(w)] in that the label fails to declare all the known major food allergens in the manner required by the Act.

Section 201(qq) of the Act [21 U.S.C. 321(qq)] defines as "major food allergens" milk, egg, fish, Crustacean shellfish, tree nuts, wheat, peanuts, and soybeans, as well as any food ingredient that contains protein derived from one of these foods, with the exception of highly refined oils. A food is misbranded under section 403(w) if it is not a raw agricultural commodity and it is, or it contains an ingredient that bears or contains, a major food allergen, unless either:

- The word "Contains," followed by the name of the food source from which the major food allergen is derived, is printed immediately after or is adjacent to the list of ingredients, section 403 (w)(1)(A) of the Act [21 U.S.C. § 343(w)(1)(A)]; or
- The common or usual name of the major food allergen in the list of ingredients is followed in parentheses by the name of the food source from which the major food allergen is derived, except that the name of the food source is not required when either the common or usual name of the ingredient uses the name of the food source from which the major food allergen is derived; or the name of the food source from which the major food allergen is derived appears elsewhere in the ingredient list (unless the name of the food source that appears elsewhere in the ingredient list appears as part of the name of a food ingredient that is not a major food allergen), section 403 (w)(1)(B) of the Act [21 U.S.C. § 343(w)(1)(B)].

The ingredient statement for the Ghara-Ghoroot Lavashak declares both "Whey" and "Yogurt" as ingredients. However, the product label fails to

declare the presence of the major food allergen, milk. Furthermore, as is discussed below, you are required to declare the component ingredients of the yogurt.

3. Your Sour Cherry Juice (two unique brand names) and Sour Grape Juice (four unique brand names) products are misbranded within the meaning of section 403(i)(1) of the Act [21 U.S.C. § 343(i)(1)] because the statement of identity does not bear an accurate common or usual name. According to 21 CFR 102.33(a), for a carbonated or noncarbonated beverage that contains less than 100 percent and more than 0 percent fruit or vegetable juice, the common or usual name shall be a descriptive name that meets the requirements of 21 CFR 102.5 (a) and, if the common or usual name uses the word "juice," shall include a qualifying term such as "beverage," "cocktail," or "drink" appropriate to advise the consumer that the product is less than 100 percent juice (e.g., "diluted apple juice beverage" or "apple juice drink"). Your products are labeled as "juice," however based on your list of ingredients for each juice, your products do not qualify to be labeled as "juice" without a qualifying term to indicate that the product contains less than 100 percent juice.

4. Your juice products are further misbranded within the meaning of section 403(i)(2) of the Act [21 U.S.C. § 343(i)(2)]. In particular,

- Your Sour Cherry Juice (two unique brand names) and Sour Grape Juice (four unique brand names) products do not contain declarations of the percentage of juice in the products as required by 21 CFR 101.30(b).

- Your Sour Grape Juice products (four unique brand names) are fabricated from two or more ingredients and the labels fail to declare the common or usual name of each ingredient in accordance with section 403(i)(2) of the act. Your formulation sheet for these four Sour Grape Juice products indicates that water, salt, and citric acid are used; however the ingredients are not declared on your label.

- Your Vegetable Stew ingredient statement fails to include onion, water, garlic powder, turmeric, black pepper, citric acid, salt, and sodium benzoate (and a separate description of its function, as required by 21 CFR 101.22(j) in situations where a chemical preservative is added), all of which are contained in the product according to your production records. For foods that are fabricated from two or more ingredients, the common or usual name of each such ingredient must appear on the label as required by section 403(i)(2) of the act and in the manner set forth in 21 CFR 101.4. Furthermore, the label lists the ingredient mint, which is not in the product recipe. Under section 403(a)(1) of the Act [21 U.S.C. § 343(a)(1)], a food is misbranded if its labeling is false in any particular.

- Your Ghara-Ghoroot Lavashak product label declares "Yogurt" as an ingredient, but it does not comply with 21 CFR 101.4(b)(2), which sets out two alternatives for designating an ingredient such as yogurt that itself contains two or more ingredients. In such a situation, you must either declare the established common or usual name of the ingredient (here, "yogurt") followed by a parenthetical listing of all ingredients contained therein in descending order of predominance (unless the ingredient is a food subject to a definition and standard of identity that has specific labeling provisions for optional ingredients) [21 CFR 101.4(b)(2)(i)]; or else you must incorporate into the statement of ingredients in descending order of predominance in the finished food, the common or usual name of every component of the ingredient without listing the ingredient itself [21 CFR 101.4(b)(2)(ii)]. While yogurt is subject to a definition and standard of identity, the relevant provision states that each of the ingredients used in yogurt shall be declared on the label as required by the applicable sections of part 101 [21 CFR 131.200(g)].

5. Your products are misbranded within the meaning of Section 403(q) of the Act [21 U.S.C. § 343(q)] in that the nutrition facts information is not in an appropriate format as defined in 21 CFR 101.9. Specifically,

- The sodium content for your Shemshad Sour Grape Juice and Shams Sour Grape Juice products is not expressed to the nearest 5-milligram increment, as required when a serving contains 5 to 140 milligrams of sodium [21 CFR § 101.9(c)(4)];
- Because the saturated fat for your Lavashak Alou contains less than 0.5 gram per serving, the content must be expressed as zero [21 CFR § 101.9(c)(2)(i)];
- The saturated fat declaration for your Lavashak Alou must be listed above the trans fat declaration in accordance with 21 CFR § 101.9(c);
- The heading "Amount Per Serving" in the Nutrition Facts box for your Indo-European Sour Grape Juice is not provided, as required by 21 CFR 101.9(d)(1)(iv);
- The serving size declared for your Walnut Stew is inaccurate and must be determined based on the reference amount customarily consumed (RACC) [21 CFR 101.12(b)]. Specifically, your Walnut Stew declares a serving size of ½ cup (58g), however 21 CFR 101.12 (b), Table 2 for Soup (all varieties) indicates that the serving size for soup must be based on the RACC of 245g;
- The quantity of trans fat is not provided for in your Walnut Stew and Ghara-Ghoroot Lavashak, as required by 21 CFR 101.9(c)(2) (ii) for products that contain 0.5 grams or more of total fat in a serving. Your Walnut Stew declares 4 grams of total fat per serving (see above for a discussion of your inaccurate serving size for this product), and your Ghara-Ghoroot Lavashak declares 5 grams of total fat per serving;
- Calcium in your GOLCHIN Sour Grape Juice is not expressed to the nearest 2-percent increment, as required by 21 CFR 101.9(c)(8) (iii) for products containing up to and including 10 percent of the Daily Value (DV);
- Iron and Vitamin C in your GOLCHIN Sour Grape Juice are not expressed to the nearest 5-percent increment, as required by 21 CFR 101.9(c)(8)(iii) for products containing above 10 percent and up to and including 50 percent of the DV;
- The amount of protein is not provided for in your GOLCHIN Sour Grape Juice, as required by 21 CFR 101.9(c)(7);

For additional information on General Food Labeling requirements go to
http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition/FoodLabelingGuide/default.htm [2].

6. Your Shemshad Ghara-Ghoroot Lavashak, Shemshad Sour Grape Juice and Shams Sour Grape Juice products are misbranded with the meaning of section 403(f) of the Act [21 U.S.C. § 343(f)], because your product labels contain information in two languages but do not repeat all the required label information in both languages. In accordance with 21 CFR 101.15(c)(2), if a product label contains any representation in a foreign language, all words, statements, and other information required by or under authority of the Act to appear on the label must appear in the foreign language.

**Unapproved New Drug**

Your GOLCHIN Sour Grape Juice product label promotes your juice beverage product for a condition that causes it to be a drug under section 201 (g)(1) of the Act [21 U.S.C. § 321(g)(1)]. This product label contains the therapeutic claim "Helps lower high cholesterol," which establishes that the product is a drug because it is intended for use in the cure, mitigation, treatment, or prevention of disease.

The marketing of this product with this claim violates the Act. Your product is not generally recognized as safe and effective for the above-referenced use. Therefore, the product is a "new drug" under section 201(p) of the Act [21 U.S.C. § 321(p)]. New drugs may not be legally marketed in the U.S. without prior approval from FDA as described in section 505(a) of the Act [21 U.S.C. § 355(a)]. FDA approves a new drug on the basis of scientific data submitted by a drug sponsor to demonstrate that the drug is safe and effective.

The above violations are not intended to be an all-inclusive list of violations in your plant. It is your responsibility to ensure that your facility and all of your products are in compliance with the Act and all applicable federal regulations.

You should take prompt action to correct the violations cited in this letter and to establish and implement procedures that will prevent them from occurring in the future. Failure to implement lasting corrective action on violations may result in regulatory action being initiated by FDA without further notice, such as seizure, injunction, and/or issuance of an Order of Need to obtain and hold a Temporary Emergency Permit.
We have reviewed your response dated October 15, 2010, to the FDA Form 483 issued during the September 2010 inspection. Your response is inadequate because although it indicates that corrections have or will be made regarding several of the violative conditions documented on the

Form 483, it does not provide any documentation or other evidence of actions your firm has taken to correct the violations noted.  Examples of such evidence include: evidence that you are working with a process authority or that your scheduled processes have been filed with the FDA; processing and production records; documentation of any pest-control measures you have taken; documentation of measures you have taken to institute hygienic practices; and revised product labels.

In addition to the above violations, we also have the following labeling comments:

• Your Sour Grape Juice product labels (four unique brand names) declare the percent of Daily Value for Calcium differently from one another, although the products are manufactured in an identical manner.  The Shams Sour Grape Juice and Shemshad Sour Grape Juice products state that they contain 48% of the DV for Calcium, whereas your GOLCHIN Sour Grape Juice product states that it contains 1% of the DV for Calcium.  We question the accuracy of these declarations as well as the source of Calcium you account for in your juice products.  Your formulation sheet for the four Sour Grape Juice products indicates that sour grape juice, water, salt, and citric acid are the only ingredients used in the products' manufacture.  Your fourth brand of Sour Grape Juice products, the Indo-European Sour Grape Juice, has a place on its label where the percent of DV for Calcium is indicated, but there is no percentage listed; there is only the symbol "*".  The symbol "*" is not defined, nor is a value for Calcium presented anywhere on the label [21 CFR 101.9(c)(8)].

• Your Ghara-Ghoroot Lavashak product label declares "Approx. 2 Oz (56.7g)" for the net quantity of contents statement.  The net quantity statement should accurately reveal the quantity of food in the package in accordance with 21 CFR 101.105(g).

• If the citric acid is functioning as a preservative in your finished juice products, that function needs to be included in accordance with the requirements of section 403(k) of the Act [21 U.S.C. § 343(k)] and 21 CFR 101.22(j).

We request that you notify this office in writing within 15 working days from your receipt of this letter of the current status of your corrective actions and the specific steps you have taken to correct the noted violations. In your response, include documentation of your corrective actions or steps towards long term, corrective action. If you cannot complete all corrections before you respond, we expect that you will explain the reason for your delay and please include a timetable for the implementation of any remaining corrections.

Please send your reply to the Food and Drug Administration, Attention:

Blake Bevill
Director Compliance Branch
Los Angeles District
19701 Fairchild
Irvine, CA, 92612-2506

IIf you have questions regarding any issues in this letter, please contact David Whitman, Compliance Officer at 858-550-3850 x106.


Sincerely,

/s/


Alonza E. Cruse
District Director
Los Angeles District

---

**Links on this page:**

1. http://www.fda.gov

2. http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition/FoodLabelingGuide/default.htm


- Accessibility
- Contact FDA
- Careers
- FDA Basics
- FOIA
- No Fear Act
- Site Map
- Transparency
- Website Policies


U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Email FDA

- USA.gov
- 
- 
- 
-

- 
- For Government
- For Press
- Combination Products
- Advisory Committees
- Science & Research
- Regulatory Information
- Safety
- Emergency Preparedness
- International Programs
- News & Events
- Training and Continuing Education
- Inspections/Compliance
- State & Local Officials
- Consumers
- Industry
- Health Professionals

U.S Department of **Health & Human Services**

**Links on this page:**

1. http://www.fda.gov

2. http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition/FoodLabelingGuide/default.htm

# EXHIBIT C



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

_____

Food and Drug Administration
College Park, MD 20740

JUL 0 3 2008

Audrae Erickson
President
Corn Refiners Association
1701 Pennsylvania Avenue, N.W.
Suite 950
Washington, DC 20006-5805

Dear Ms. Erickson:

This is in follow up to the meeting of April 16, 2008, between the Corn Refiners Association and the
Center for Food Safety and Applied Nutrition (CFSAN).  The meeting was prompted by a Food
Navigator-USA.com article on the use of the term "natural" on products containing high fructose corn
syrup (HFCS).  You asked CFSAN to reconsider its position on whether the use of the term "natural"
can be used to describe products containing HFCS.

At the meeting Mr. Empie of Archer Daniels Midland Company described the manufacturing process
used to make HFCS and following the meeting you sent CFSAN a written description of this production
process.  During the meeting, we stated that our longstanding policy on the use of the term "natural" is
that "natural" means that nothing artificial (including artificial flavors) or synthetic (including all color
additives regardless of source) has been included in or has been added to a food that would not normally
be expected to be in the food.  Additionally, we stated that we do not restrict the use of the term
"natural" except on products that contain added color, synthetic substances and flavors as provided for
in Title 21 of the Code of Federal Regulations (CFR), section 101.22.  After reviewing the information
about the HFCS production process that you provided, it is our understanding that the enzyme used to
make HFCS is fixed to a column by the use of the synthetic fixing agent, glutaraldehyde.  Any unreacted
glutaraldehyde is removed by washing the column prior to the addition of the high dextrose equivalent
corn starch hydrolysate, which undergoes enzymatic reaction to produce HFCS.  Because the
glutaraldehyde does not come into contact with the high dextrose equivalent corn starch hydrolysate, it
would not be considered to be included in or added to the HFCS.  Therefore, we would not object to the
use of the term "natural" on a product containing the HFCS produced by the manufacturing process
described by Mr. Empie.  However, we would object to the use of the term "natural" on a product
containing HFCS that has a synthetic substance such as a synthetic fixing agent included in or added to
it.  We would also object to the use of the term "natural" on a product containing HFCS if the acids used
to obtain the starch hydrolysate do not fit within our policy on "natural" as stated above.

JUL-03-2008   10:26   FDA/CFSAN/ONPLDS   301 436 2639   P.03

Page 2-Audre Ericson

For your information, when we received an inquiry from Food Navigator-USA.com asking us whether a "natural" claim on a product containing HFCS and natural ingredients would be misleading to consumers, we reviewed our policy on the use of the term "natural" and our regulations on HFCS. In our response we stated our longstanding policy on the use of the term natural that we described above. We also described our regulation on HFCS (Title 21 of the Code of Federal Regulation (CFR), section 184.1866), which states that it is prepared from a high dextrose equivalent corn starch hydrolysate by partial enzymatic conversion of glucose (dextrose) to fructose using an insoluble glucose isomerase enzyme preparation listed at 21 CFR 184.1372. We indicated that, per 184.1372, the glucose isomerase enzyme preparation is fixed (rendered insoluble) using safe and suitable immobilization/fixing agents, including those listed in 21 CFR 173.357. We stated that the use of synthetic fixing agents in the enzyme preparation, which is then used to produce HFCS, would not be consistent with our policy on the use of the term "natural." Consequently, we said that we would object to the use of the term "natural" on a product containing HFCS. In addition, we stated that the corn starch hydrolysate, which is the substrate used in the production of HFCS, may be obtained through the use of safe and suitable acids or enzymes. Depending on the type of acid(s) used to obtain the corn starch hydrolysate, this substrate itself may not fit within the description of "natural" and, therefore, we stated that HFCS produced from such corn starch hydrolysate would not qualify for a "natural" labeling term. Subsequently, we learned that in the process described by Mr. Empie none of the fixing agent (glutaraldehyde) would come in contact with the high dextrose equivalent corn starch hydrolysate. Consistent with our policy on the use of the term "natural," we have stated in the past that the determination on whether an ingredient would qualify for the use of the term "natural" is done on a case-by-case basis. Further, ingredients with the same common or usual name may be formulated in different ways, where a food containing the ingredient formulated one way may qualify for the use of term "natural" and another food containing the ingredient with the same common or usual name, which has been formulated in a different way may not be eligible for the use of the term "natural."

If we may be of further assistance, please let us know.

Sincerely yours,

*Geraldine A. June*

Geraldine A. June
Supervisor
Product Evaluation and Labeling Team
Food Labeling and Standards Staff
Office of Nutrition, Labeling
    and Dietary Supplements
Center for Food Safety
    and Applied Nutrition

TOTAL P.03